307 Ga. 254
FINAL COPY

S19A0803.  EBERHART v. THE STATE.

BOGGS, Justice.

Appellant Marcus Lecarl Eberhart, a former City of East Point police sergeant, challenges his 2016 conviction for felony murder predicated on aggravated assault in connection with the tasing death of Gregory Lewis Towns, Jr. Appellant contends that the evidence presented at trial was legally insufficient to support his conviction for two reasons. First, he argues that this Court's decision in *Ford v. State*, 262 Ga. 602 (423 SE2d 255) (1992), precludes his felony murder conviction. Second, he argues that proof of intense physical pain is not enough, standing alone, to support a jury finding of serious bodily injury as required for the aggravated assault predicate for his felony murder conviction. As explained below, *Ford* has no application here, because the predicate for the felony murder conviction is aggravated assault with a deadly weapon. Moreover, the State presented expert medical testimony that the repeated

tasing of Towns proximately caused not merely the infliction of intense physical pain, but also death. Accordingly, we affirm Appellant's felony murder conviction.[1]

1. Appellant challenges the sufficiency of the evidence to support his conviction for felony murder based on aggravated assault with a deadly weapon. Viewed in the light most favorable to the verdicts, the evidence presented at trial showed as follows.

(a) In January 2001, Appellant joined the East Point Police Department ("EPPD"). He was trained annually on the EPPD's standard operating procedures, rules, and regulations

---

[1] The crimes occurred on the afternoon of April 11, 2014. On August 17, 2015, a Fulton County grand jury indicted Appellant and Howard J. Weems, Jr. for felony murder, aggravated assault with a deadly weapon, involuntary manslaughter based on reckless conduct, and reckless conduct, as well as three counts each of violation of an oath by a public officer. Appellant and Weems were tried together in December 2016, and at the end of the two-week trial, the jury found Appellant guilty as charged. (The jury acquitted Weems of felony murder, aggravated assault, and one count of violation of an oath by a public officer but found him guilty of the other charges.) On December 21, 2016, the trial court held a hearing and then sentenced Appellant to serve life in prison for felony murder and a concurrent term of 18 months for one count of violating his oath of office; Appellant's other guilty verdicts merged. Appellant filed a premature motion for new trial on December 20, 2016, which he amended on August 2, 2018. On November 16, 2018, the trial court held a hearing on the motion, which the court denied on January 23, 2019. Appellant then filed a timely notice of appeal. The case was docketed in this Court for the April 2019 term and was orally argued on June 19, 2019.

("SOPs"), which require officers to obey the law, among other things. The use-of-force SOP says: "It is the policy of the East Point Police Department that employees use only that force which is reasonable and necessary to [e]ffect a lawful arrest, detain or control subjects, overcome resistance or to protect themselves or others from injury or death." This SOP specifically prohibits the use of "unnecessary or unreasonable force against any person or property," and supervisors are responsible for ensuring that officers under their command comply with the requirements of the use-of-force SOP.

The use-of-force SOP lists five levels of suspect cooperation or resistance, which correspond to the five levels of force that an officer is permitted to use in response. Level 1 applies to suspects who are "*compliant*" and specifies that the appropriate level of force is "cooperative controls, including officer presence, hand signals, verbal commands and instructions or light touching." Level 2 applies to suspects who are "*passively resistant*" and says that the appropriate level of force is "contact controls, including strong or forceful soft hand control, hand and arm holds etc." Level 3 applies

3

to suspects who are "*actively resistant*," which the SOP says is the "threshold for a reasonable officer to consider this suspect to be a potential threat to himself, the officer or other citizens." An officer is permitted to respond to a suspect who is actively resistant with "compliance techniques," which may include the use of pepper spray or an electronic control weapon such as a TASER.[2] Other authorized compliance techniques are "forced movement" and "physical force such as forcing the suspect's limbs behind his back, forcing the suspect to the ground or against a wall or other physical force in an attempt to gain control."

Levels 4 and 5 apply to suspects who are "*combative*." Level 4 applies to a combative suspect who "*represent[s] a threat of bodily harm to the officer or others*," and the appropriate level of force is "immediate defensive tactics," which may include the use of "impact weapons (batons), hard hands, or any other reasonable means

---

[2] See *Gosserand v. Parish of Jefferson*, No. 05-5005, 2006 WL 3247113, at *1 n.1 (E.D. La. Nov. 7, 2006) ("TASER is the tradename for electroshock guns, which are used widely by law enforcement agencies world-wide. The name 'TASER' is an acronym for 'Thomas A. Swift's Electric Rifle,' designed in 1969 by inventor Jack Cover.").

4

available and at hand to stop the aggression, defend against the attack and bring the suspect into compliance." Level 5 applies to a combative suspect who "*represent[s] a threat of serious bodily harm or death to the officer or others*," and the appropriate level of force is "deadly force," which includes the use of firearms and "any other means immediately available that an objectively reasonable officer, in the same circumstance, would consider necessary to prevent death or serious bodily injury."

In 2005, the EPPD began equipping some of its officers with TASER electronic control weapons, and in 2010, Appellant became TASER-certified. As part of the certification process, Appellant was trained on the EPPD's less-lethal weapons SOP. The less-lethal weapons SOP applies to the three "types of less lethal weapons authorized" by the EPPD: (1) pepper spray; (2) "the expanding metal baton (also referred to as the ASP baton)"; and (3) TASERs. The SOP establishes a reporting procedure to be followed "[w]henever serious bodily injury or death occurs from the use of a less lethal weapon."

The less-lethal weapons SOP addresses the use of TASERs and says that "[t]he TASER is designed to control violent or actively resisting subjects where alternative restraint tactics have or are reasonably likely to fail and/or it would be unsafe for officers to employ alternative means." The SOP further states that "[t]he TASER may be used as a compliance technique when the suspect is perceived by the officer to be actively resistant and considered a potential threat to himself, the officer or other citizens." The SOP specifies that a TASER "may only be used" in two circumstances: "[t]o overcome violent or assaultive behavior or its threat" or "[t]o control persons in order to prevent them from harming themselves or others." The SOP also specifies several circumstances in which use of a TASER is not authorized, including "[t]o escort or prod subjects" or "[a]gainst subjects who are offering only passive resistance." In addition, the SOP says that use of a TASER is not authorized "[a]gainst handcuffed subjects" unless "exigent circumstances" exist.

According to the SOP, an officer trained and certified to carry

6

a TASER may deploy the TASER without prior supervisory approval, but a supervisor must be notified as soon after as practicable, and "[w]henever a TASER is applied to a person as a fired probe or drive stun an on-duty supervisor will respond to the location of the incident."[3] Moreover, a "Use of Force Report will be completed anytime" the TASER is used except in training or mandatory testing prior to each shift.

(b)     Although Appellant was assigned to the EPPD's Traffic Division, on Friday, April 11, 2014, he was filling in as a supervisor for the Uniform Patrol Division on the day shift, which ran from 8:00 a.m. to 4:00 p.m. At 3:15 p.m., Towns' girlfriend called 911 to report that Towns had assaulted her, and two minutes later, dispatch put out a call over police radio for officers to respond to a

---

[3] Evidence presented at trial showed that in probe mode, two metal darts shoot out of the front of the TASER and lodge in the target's body. The TASER then emits a series of electrical pulses through wires connected to the darts over a cycle of five seconds that disrupts the target's central nervous system and causes involuntary muscle contractions. In drive-stun mode, two electrodes in the front of the TASER are placed in direct contact with, or extremely close to, the target's skin. This method also uses a series of electrical pulses over a period of five seconds, but it functions by inducing pain rather than involuntary muscle contractions.

7

report of domestic violence at the townhouse complex where Towns' girlfriend lived.

At 3:17 p.m., two EPPD officers responded to the townhouse complex. As Officers Nicole P. Allen and Irvin G. Johnson III waited in their patrol cars for dispatch to send them the gate code, they saw Towns walk out of a nearby pedestrian gate. Towns, who was more than six feet tall and weighed 281 pounds, matched the description of the suspect provided by dispatch – a black male on foot wearing red pants and no shirt; Towns was putting on a t-shirt as he walked out of the pedestrian gate. The officers got out of their vehicles and told Towns that they needed to speak with him, but Towns ignored them and kept walking. Officer Johnson noticed that Towns was sweating, which was consistent with having just come from an argument or a fight. For safety reasons, Officer Johnson then told Towns that he was being detained until the officers figured out what was going on. When Officer Johnson put his hand on Towns' forearm to handcuff him, Towns slapped his hand away and took off running across the street and into a heavily wooded area that led to a row of

8

houses on the next street over.

Both officers ran after Towns, but a couple of minutes later, Officer Allen realized that the patrol cars were unlocked with the keys inside, and she turned back to secure the vehicles. Officer Johnson continued the chase. After a few more minutes of running, Towns' pants slid down, and he tripped over a log and fell to the ground. Towns kicked off his pants, losing a shoe in the process, but before he could get up and continue running, Officer Johnson caught up to him. Towns was lying face down on the ground when Officer Johnson got to him, and Officer Johnson ordered Towns to put his hands behind his back. Towns refused at first, but when Officer Johnson threatened to pepper spray him in the face, Towns said, "okay, you got me," and he put his hands behind his back so that Officer Johnson could handcuff him. From that point on, Towns did not attempt to flee, struggle, fight, or otherwise actively resist attempts to get him to walk out of the woods to a patrol car so that he could be taken to jail.

At 3:22 p.m., Officer Johnson radioed that he had the suspect

9

in custody. Officer Johnson then reported their location, which was behind a house one street over from the townhouse complex. Officer Johnson requested backup and an ambulance for Towns, who was breathing heavily and kept saying that he was tired. Appellant came over the radio and said to hold off on the ambulance until he arrived and assessed the situation. Officer Johnson and Towns then sat catching their breath as they waited for the other officers to arrive.

At 3:23 p.m., Officer Rachel Robinson arrived with Appellant's co-defendant, Corporal Howard J. Weems, Jr., followed by Officer Allen and then Appellant. Officer Robinson and Corporal Weems walked into the backyard of the house, down an embankment, across a small creek, and up the other side to get to Officer Johnson and Towns so that they could help get Towns up and escort him to a patrol car. Officer Johnson, Officer Robinson, and Corporal Weems were able to get Towns on his feet, but after walking a few steps, Towns collapsed to the ground and complained that he was tired. Officer Johnson and Corporal Weems helped Towns to his feet a second time, and Towns again walked a few steps toward the creek

10

before falling back down into a seated position. At that point, Towns was lethargic and breathing heavily, but he was still conscious and able to talk.

Appellant, Corporal Weems, and Officer Robinson were all equipped with a TASER X26. Appellant called to Towns from across the creek and ordered him to get up and walk. Towns kept saying that he was tired, and Appellant ordered Corporal Weems to "tase his ass" if he did not get up. Corporal Weems pulled out his TASER and pressed it against Towns' stomach to shock him in drive-stun mode. Towns then said that he would get up, and the officers helped him to his feet, but after taking a few steps, he fell back down. Appellant crossed the creek and walked up the embankment, where he again ordered Towns to get up. When Towns said he was too tired, Appellant pulled out his TASER and pressed it against Towns' leg, shocking him. Towns then got up with assistance and took two steps forward before falling down.

The record shows that Appellant and Corporal Weems repeatedly tased Towns in drive-stun mode to induce him to comply

11

with their orders to get up and walk out of the woods. At one point when Towns was threatened with being shocked again, he said, "Give me a second, I'm tired." He then got to his feet with assistance only to fall yet again, this time rolling down the embankment into the creek. When he was ordered to get up again, Towns said that he had already been tased ten times and could not get up, because he was too tired. Appellant tased Towns at least twice in drive-stun mode while Towns was sitting in the creek. Towns eventually stopped talking, and according to a neighbor who walked down to the creek to offer assistance, Towns appeared to be "asleep with his eyes open" and looked like he was dead.

At 3:43 p.m., Appellant called for an ambulance to do a welfare check on Towns. Fire and rescue arrived at 3:55 p.m. A paramedic examined Towns, who was still handcuffed. Towns was unresponsive, was not breathing, and had no discernible pulse. The paramedic had to ask the officers to remove the handcuffs in order to perform CPR. Fire and rescue got Towns onto a backboard, and four or five people carried Towns out of the woods to a waiting

ambulance. Towns was rushed to the hospital, but efforts to restart his heart were unsuccessful. Towns was pronounced dead at 4:33 p.m.

A GBI special agent interviewed Appellant later that evening and again on April 23, 2014, and Appellant provided his version of events.[4] Appellant did not say in the interviews that he felt threatened when he tased Towns. To the contrary, Appellant said that Towns was "calm . . . the whole time." Appellant also said: "They can tell me, well, you can't use force on somebody who's cuffed, but what am I supposed to do?" Appellant acknowledged that Towns repeatedly said that he was too tired to get up and walk out of the woods and that Towns asked to be carried out.

Data downloaded from the TASERs showed that Corporal Weems pulled the trigger on his TASER four times and that Appellant pulled the trigger on his TASER ten times. The medical examiner determined that Towns died from hypertensive

---

[4] Audio recordings of both interviews were admitted at trial and played for the jury.

cardiovascular disease exacerbated by physical exertion and "conducted electrical stimulation" from the application of the TASERs in drive-stun mode.

(c) The State presented numerous witnesses at trial, including Officer Allen, Officer Johnson, and Officer Robinson. Officer Allen and Officer Robinson testified based on their training that it was unnecessary to tase Towns in drive-stun mode, and Officer Johnson said that once Towns was handcuffed, he was no longer actively resistant. Two neighbors who witnessed the incident testified that Towns was not behaving aggressively toward anyone at the time. The officers who provided Appellant's TASER training in 2010 and 2012 both testified that Appellant's actions violated his training and the EPPD's SOPs. One of the training officers described the pain inflicted by a TASER in drive-stun mode as a ten on a scale of one to ten, and the other said that being tased in drive-stun mode was one of the most painful things that he had ever experienced.

Two EPPD police captains and the chief of police testified that there was no evidence of exigent circumstances that would have

14

justified tasing Towns while his hands were cuffed behind his back. Multiple officers testified that, based on their review of the facts, Towns was passively resistant when Appellant tased him and ordered Corporal Weems to tase him. Both the State's use-of-force expert and the defense's use-of-force expert agreed that Towns was passively resistant, not actively resistant. The chief of police further testified that Appellant's actions violated the EPPD's SOPs and that Appellant was subsequently terminated from the EPPD as a result. In addition to the medical examiner's testimony, a cardiac electrophysiologist testified that the repeated tasing accelerated Towns' death, and a forensic pathologist testified that the tasing caused Towns' death by exacerbating his pre-existing heart condition.

Appellant did not testify at trial. He did, however, call several expert witnesses who contradicted the opinions of the State's experts concerning Towns' cause of death.

2.    Appellant claims that the evidence presented at trial and summarized above was legally insufficient to support his conviction

15

for felony murder based on aggravated assault with a deadly weapon. We disagree.[5]

(a) When considering legal sufficiency, we put aside any questions about conflicting evidence, the credibility of witnesses, or the weight of the evidence, leaving the resolution of such matters to the discretion of the jury. See *Williams v. State*, 302 Ga. 404, 406 (807 SE2d 418) (2017). Instead, we view the evidence in the light most favorable to the verdicts, and we ask only whether a rational trier of fact could find beyond a reasonable doubt that the defendant is guilty of the crimes for which he was convicted. See *Jackson v. Virginia*, 443 U. S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979).

"A person also commits the offense of murder when, in the commission of a felony, he causes the death of another human being

---

[5] Appellant also claims that the evidence presented at trial was legally insufficient to support the jury's verdict finding him guilty of involuntary manslaughter. This claim is moot, however, because no conviction or sentence was entered on the involuntary manslaughter verdict. See *Hayes v. State*, 298 Ga. 339, 340 n.2 (781 SE2d 777) (2016).

irrespective of malice." OCGA § 16-5-1 (c) (2009).[6] The main difference between felony murder and malice murder is that felony murder does not require proof of malice or intent to kill. See *Guyse v. State*, 286 Ga. 574, 576 (690 SE2d 406) (2010). Aggravated assault has two elements: (1) commission of a simple assault as defined by OCGA § 16-5-20; and (2) the presence of one of several statutory aggravators. See OCGA § 16-5-21 (a). The statutory aggravator at issue here is the use of a deadly weapon or an "object . . . which, when used offensively against a person, is likely to or actually does result in serious bodily injury[.]" OCGA § 16-5-21 (a) (2). See also *Guyse*, 286 Ga. at 576. And the trial court instructed the jury consistent with that statutory text. When properly viewed in the light most favorable to the verdicts, the evidence presented at trial and summarized above was sufficient to enable a rational jury to find that Appellant assaulted Towns with his TASER, which actually did result in serious bodily injury to Towns. See *State v.*

---

[6] Effective July 1, 2014, the General Assembly amended OCGA § 16-5-1 (c) to eliminate the word "also" and to replace "he" with "he or she." See Ga. L. 2014, p. 444, § 1-1.

17

*Jackson*, 287 Ga. 646, 649 (697 SE2d 757) (2010) (discussing proximate cause); *Vega v. State*, 285 Ga. 32, 33 (673 SE2d 223) (2009) ("'It was for the jury to determine the credibility of the witnesses and to resolve any conflicts or inconsistencies in the evidence.'" (citation omitted)). Accordingly, the evidence was sufficient to support Appellant's conviction for felony murder based on aggravated assault with a deadly weapon. See *Jackson v. Virginia*, 443 U. S. at 319.[7]

Moreover, the jury was free to reject Appellant's claims of justification and accident. See OCGA §§ 16-2-2 ("A person shall not be found guilty of any crime committed by misfortune or accident where it satisfactorily appears there was no criminal scheme or

---

[7] The jury charge on aggravated assault included both the "likely to . . . result in" language and the "actually does result in" language. The evidence here plainly was sufficient to support Appellant's felony murder conviction based on an assault with an object that, when used offensively against Towns, actually did result in serious bodily injury, which includes death. The indictment did not include the "actually does result in" language, but that poses not a sufficiency issue but rather a potential variance issue that Appellant waived by failing to raise it in the trial court. See *Davis v. State*, 301 Ga. 397, 402 (801 SE2d 897) (2017). See also *Hanson v. State*, 305 Ga. App. 900, 902 (700 SE2d 896) (2010) ("Failure to raise a fatal variance issue in the court below waives the matter on appeal.").

undertaking, intention, or criminal negligence."), 16-3-20 (2), (4) ("The fact that a person's conduct is justified is a defense to prosecution for any crime based on that conduct. The defense of justification can be claimed: . . . [w]hen the person's conduct is in reasonable fulfillment of his duties as a government officer or employee; [or] . . . [w]hen the person's conduct is reasonable and is performed in the course of making a lawful arrest . . . ."). "Questions as to the existence of justification are for a jury to decide." *Johnson v. State*, 304 Ga. 610, 612 (820 SE2d 690) (2018). Likewise, whether Appellant repeatedly tased Towns in drive-stun mode by accident was a question for the jury.

(b) Appellant contends that this Court's decision in *Ford*, 262 Ga. at 602, nevertheless precludes his felony murder conviction. As we recently explained, *Ford* "provides a defendant with an avenue to argue that a specific felony offense cannot serve as a predicate to felony murder because such offense is 'neither inherently dangerous nor life-threatening.'" *Davis v. State*, 306 Ga.

140, 151 (829 SE2d 321) (2019) (quoting *Ford*, 262 Ga. at 602).[8] But aggravated assault with a deadly weapon is the paradigmatic "inherently dangerous" felony. See *Smith v. State*, 290 Ga. 768, 771 (723 SE2d 915) (2012) (describing aggravated assault as an "inherently dangerous felony" that can support a felony murder conviction). The Court suggested as much in *Ford* itself. See 262 Ga. at 603 n.4 (referring to "an aggravated assault or other dangerous felony"). See also *Baker v. State*, 236 Ga. 754, 756 (225 SE2d 269) (1976). Accordingly, Appellant's argument that our decision in *Ford* precludes his felony murder conviction based on aggravated assault with a deadly weapon is meritless.

0(c) Appellant also contends that proof of the infliction of intense physical pain is legally insufficient, standing alone, to support a jury finding of serious bodily injury as required to support a conviction for aggravated assault with a deadly weapon.

---

[8] *Ford* has been criticized. See, e.g., *Shivers v. State*, 286 Ga. 422, 425-430 (688 SE2d 622) (2010) (Nahmias, J., concurring specially). But as in *Davis*, we have not been asked to reconsider *Ford* in this case. See *Davis*, 306 Ga. at 151 n.9.

Appellant cites no authority for such a holding. In any event, we need not consider the question further, because Appellant concedes, as he must, that the State presented sufficient evidence to enable a rational trier of fact to conclude beyond a reasonable doubt that the repeated tasing of Towns in drive-stun mode over a span of about 20 minutes when he was exhausted from running and handcuffed behind his back not only inflicted intense physical pain, but also materially accelerated his death minutes later. See *State v. Jackson*, 287 Ga. at 649. Accordingly, this argument lacks merit as well.

*Judgment affirmed. All the Justices concur, except Blackwell, J., who concurs in judgment only.*

DECIDED OCTOBER 31, 2019.
Murder. Fulton Superior Court. Before Judge Newkirk.
*Martin Brothers, John R. Martin, Sandra L. Michaels*, for appellant.
*Paul L. Howard, Jr., District Attorney, Lyndsey H. Rudder, F.*

*McDonald Wakeford, Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Katherine D. Emerson, Assistant Attorney General*, for appellee.