310 Ga. 388
FINAL COPY

S20A0887.  HINKSON v. THE STATE.

WARREN, Justice.

Appellant Shane Hinkson appeals from his conviction for felony murder predicated on aggravated assault stemming from the death of his eight-month-old son, Alexander Cabanayan.[1]  Hinkson

[1] The crimes occurred in January 2012.  A Muscogee County grand jury indicted Hinkson on July 3, 2012, for malice murder (Count 1), felony murder based on aggravated assault (Count 2), aggravated assault (Count 3), felony murder based on cruelty to children in the first degree (Count 4), cruelty to children in the first degree (Count 5), felony murder based on cruelty to children in the second degree (Count 6), and cruelty to children in the second degree (Count 7).  After a pre-trial hearing, the trial court nolle prossed Counts 6 and 7.  At a jury trial in July 2015, Hinkson was found not guilty of malice murder but guilty of the lesser included charge of involuntary manslaughter on Count 1 and guilty of Counts 2 to 5.  On August 20, 2015, the trial court sentenced Hinkson to serve life in prison with the possibility of parole for felony murder based on aggravated assault.  The other felony murder count was vacated by operation of law, and the trial court merged the remaining counts; the State has not challenged the sentences.  See *Dixon v. State*, 302 Ga. 691, 698 (808 SE2d 696) (2017).  Hinkson timely filed a motion for new trial on August 20, 2015, which he amended on September 28, 2018.  After a hearing on December 3, 2018, the trial court denied Hinkson's motion for new trial on December 20, 2018.  Hinkson purported to amend his motion for new trial a second time on January 4, 2019.  See OCGA § 5-5-40 (b) (providing that a motion for new trial "may be amended any time on or before the ruling thereon").  After being considered by the trial court without a hearing, the trial court denied the purported second amended motion for new trial on January 22, 2019.  A notice of appeal was filed on January 22, 2019, which was timely

claims that the jury returned invalid verdicts, that his indictment was defective in several respects, and that the trial court erred in admitting into evidence the pre-trial statement that he made to the police and evidence of a gun found in his apartment. We affirm.

1. Viewed in the light most favorable to the jury's verdicts, the evidence presented at Hinkson's trial showed the following. Hinkson and Jennifer Cabanayan met in the fall of 2010, and by the end of 2011, their son Alexander was eight months old and the couple was engaged to be married. On December 31, 2011, Jennifer dropped off Alexander at Hinkson's apartment in Columbus on her way to work. Hinkson, who was in the Army and stationed at Fort Benning, had agreed to watch Alexander that day and also that night while Jennifer went out with friends to celebrate New Year's Eve. However, Hinkson was upset that Jennifer was going out, and the couple argued over text and phone calls late that evening and

from the December 20, 2018 denial of the motion for new trial because the due date for the notice of appeal fell on a Saturday, and Monday, January 21, was a legal holiday. See OCGA § 1-3-1 (d) (3). This case was docketed in this Court to the April 2020 term and submitted for a decision on the briefs.

into the early morning of New Year's Day. Jennifer stayed at a friend's house that night and then went straight to work in the morning. Alexander remained with Hinkson. After a missed call and a few text messages from Hinkson while she was at work, Jennifer received a phone call from Hinkson at 1:55 p.m. in which he told her that she needed to come to his apartment "right away" because "something bad had happened." Jennifer arranged for a ride there from her boss.

At trial, Jennifer testified that she called Hinkson on the way to his apartment and that she was "trying to calm him down" because he was "very distraught" and saying "pretty horrific, scary things," like that Jennifer "couldn't call anybody" and "that if [she did call] anybody, that they would take him away." Hinkson said if she "called an ambulance and it wasn't anybody but [her] that he would shoot them." When Jennifer arrived at Hinkson's apartment at about 2:30 p.m., she found him near the kitchen, holding a gun to his head. She found Alexander on the bed, covered by a duvet. One of his eyes was looking up while the other was looking down, and he

3

was whimpering and had "things on his neck." Jennifer immediately left the apartment with Alexander, leaving Hinkson there, and her boss drove Alexander and Jennifer to a hospital in Columbus.

Alexander arrived at the hospital at approximately 2:55 p.m. Dr. Mark Anders, the emergency room physician who treated Alexander, testified that one of his eyes had swollen shut and that he had bruising on his neck. A CT scan of Alexander's head was "[m]arkedly abnormal" and showed "severe diffuse" swelling of the "entire right cerebral hemisphere" and "acute subdural hematoma over the right cerebral hemisphere." Dr. Anders testified that Alexander had a "severe amount of trauma to the entire right side of the brain." Alexander was then flown by helicopter to Children's Healthcare of Atlanta and underwent emergency brain surgery, but he died several days later on January 6, 2012.

Detective Andrew Tyner testified that the Columbus hospital called police about an hour after Alexander arrived to notify them of Alexander's injuries. Detective Tyner immediately went to the

4

hospital, where he spoke to Jennifer and medical personnel. About 30 minutes after arriving at the hospital, the detective left and went to Hinkson's apartment. Hinkson was not there, but Detective Tyner found a handgun with a single bullet in it in the apartment. Police officers ultimately brought Hinkson to their headquarters, where Detective Tyner interviewed him.

In Hinkson's recorded interview, which was played for the jury at trial, he said the following. He was angry with Jennifer, and Alexander would not stop crying. He became extremely angry, "broke down," and "lost it." He "kept . . . picking [Alexander] up and putting him down." He did not "even know how long [he] was doing that for," but Alexander stopped crying. Then Hinkson went to sleep. When he woke up in the morning, he realized something was wrong with Alexander and called Jennifer to tell her that something bad had happened and she needed to come to his apartment. He thought he had "f***ed up" and he told Jennifer that "if anyone but her went through the door [he would] shoot them." He was holding a gun in his hand when Jennifer arrived, and after Jennifer left with

5

Alexander, he drove to Fort Benning, sought a chaplain, and turned himself in to military police. Hinkson had a problem with anger, he "picked [Alexander] up too hard . . . [and] put him down too hard," and he put his hand over Alexander's mouth and kept "picking him up and putting him down."

Dr. Stephen Messner, a child abuse pediatrician, testified that Alexander's injuries were caused by external trauma and that his injuries could be caused by someone picking Alexander up and forcefully slamming him on a bed. The medical examiner testified that Alexander died as a result of an "abusive head injury" and that his manner of death was homicide.

2. Hinkson does not contest the legal sufficiency of the evidence supporting his conviction for felony murder based on aggravated assault. Nevertheless, consistent with this Court's general practice in murder cases, we have reviewed the record and conclude that, when viewed in the light most favorable to the verdicts, the evidence presented at trial was sufficient to authorize a rational jury to find Hinkson guilty beyond a reasonable doubt of

6

that crime.[2]  See *Jackson v. Virginia*, 443 U.S. 307, 318-319 (99 SCt 2781, 61 LE2d 560) (1979).  Hinkson does argue that the evidence was legally insufficient to support his convictions for felony murder based on cruelty to children in the first degree and cruelty to children in the first degree, but he was not convicted of or sentenced for those counts, and, accordingly, "his claims as to the sufficiency of the evidence supporting those counts are moot." *Blackshear v. State*, 309 Ga. 479, 482 (847 SE2d 317) (2020).

Hinkson also contends that the case of *Turner v. State*, 283 Ga. 17 (655 SE2d 589) (2008), requires that we vacate the verdicts for felony murder based on aggravated assault and for involuntary manslaughter and remand the case for a new trial.  *Turner*, however, does not control this case.  We have described *Turner* as a case that involved repugnant verdicts; in other words, its "guilty and not guilty verdicts reflect[ed] affirmative findings by the jury that

---

[2] We remind litigants that the Court will end its practice of considering sufficiency sua sponte in non-death penalty cases with cases docketed to the term of court that begins in December 2020.  See *Davenport v. State*, 309 Ga. 385, 392 (846 SE2d 83) (2020).  The Court began assigning cases to the December term on August 3, 2020.

[were] not legally and logically possible of existing simultaneously."
*McElrath v. State*, 308 Ga. 104, 112 (839 SE2d 573) (2020). In
*Turner*, there were repugnant verdicts because the jury found the
defendant not guilty of malice murder based on a verdict form that
specifically found that his action in shooting the victim was justified,
but guilty on two other counts based on a verdict form that
specifically found that the same assault against the same victim was
not justified. See *Turner*, 283 Ga. at 20-21. Here, on the other hand,
the jury did not return guilty and not guilty verdicts or make any
specific findings, and *Turner* is therefore inapplicable.

Instead, Hinkson's contention regarding the impropriety of the
involuntary manslaughter and aggravated assault verdicts is
squarely controlled against him by our decision in *State v. Springer*,
297 Ga. 376 (774 SE2d 106) (2015). There, the defendant was
convicted of involuntary manslaughter based on reckless conduct, as
was Hinkson, and was also convicted of committing an aggravated
assault against the same victim. See id. at 376. Moreover, there,
like here, the jury's verdicts did not specify whether the simple

8

assault forming the basis of the aggravated assault was an attempt to "commit a violent injury to the person of another," OCGA § 16-5-20 (a) (1), or the commission of "an act which places another in reasonable apprehension of immediately receiving a violent injury[,]" OCGA § 16-5-20 (a) (2). See *Springer*, 297 Ga. at 383. Thus, it was possible that the jury in *Springer* found two different levels of mens rea for the same conduct: a finding of criminal intent for aggravated assault based on OCGA § 16-5-20 (a) (1) and a finding of criminal negligence for involuntary manslaughter based on reckless conduct. Previously, in *Jackson v. State*, 276 Ga. 408 (577 SE2d 570) (2003), we evaluated verdicts like those in *Springer* and concluded that they were mutually exclusive because they "represent[ed] a positive but illogical finding by the jury that [the defendant] acted with both criminal intent and criminal negligence." *Jackson,* 276 Ga. at 411. In *Springer*, however, we reevaluated *Jackson*, concluded that it had erred in its analysis, and overruled it and its progeny. See *Springer*, 297 Ga. at 379-383 & n.4. In overruling *Jackson*, we held in *Springer* that "multiple guilty

9

verdicts for the same conduct that are based on varying levels of mens rea are not mutually exclusive." *Springer*, 297 Ga. at 382. Accordingly, here, even if the jury found differing levels of mens rea for the same conduct (Hinkson's assault on Alexander), the verdicts are not mutually exclusive under *Springer*. Hinkson's contention regarding the illegality of his verdicts is therefore without merit.

3. Hinkson contends that the trial court erred by denying his special demurrer. We disagree.

In a special demurrer, a defendant claims that the charges in the indictment are "imperfect as to form or that the accused is entitled to more information." *Bullard v. State*, 307 Ga. 482, 486 (837 SE2d 348) (2019) (citation and punctuation omitted). "The true test of the sufficiency of an indictment to withstand a special demurrer is not whether it could have been made more definite and certain," but whether it alleges "the underlying facts with enough detail to sufficiently apprise the defendant of what he must be prepared to meet." Id. at 486-487 (citations and punctuation omitted). "And when a court considers whether an indictment is

10

sufficient to withstand a special demurrer, it is useful to remember that a purpose of the indictment is to allow a defendant to prepare his defense intelligently." Id. at 487 (citation and punctuation omitted). "We review a ruling on a special demurrer de novo to determine the legal sufficiency of the allegations in the indictment." Id. at 486.

Hinkson contends that the trial court should have granted his special demurrer as to all the crimes alleged in the indictment. However, because he was only convicted of felony murder based on aggravated assault, his complaints about the other charges in the indictment are moot. See *McKibbins v. State*, 293 Ga. 843, 848 n.11 (750 SE2d 314) (2013) (holding that, because the defendant was not convicted of felony murder, his complaint about the way the indictment charged that offense was moot). We therefore review only Hinkson's contention regarding the one crime of which he was convicted.

Count 3 of the indictment charged Hinkson with aggravated assault, specifying that he "did unlawfully make an assault upon the

11

person of Alexander Cabanayan with an object, to wit: his hands, which when used offensively against a person did result in serious bodily injury by causing an abusive head injury to Alexander Cabanayan." OCGA § 16-5-21 (a) (2) provides that an aggravated assault occurs when a person commits a simple assault, as defined by OCGA § 16-5-20 (a),[3] "[w]ith a deadly weapon or with any object, device, or instrument which, when used offensively against a person, is likely to or actually does result in serious bodily injury[.]"

Hinkson contends that Count 3 did not provide him sufficient notice to prepare for trial on that aggravated assault charge and its related felony murder charge. More specifically, he argues that the lack of detail in the indictment about what type of simple assault formed the basis of the aggravated assault charge and about the manner in which he used his hands to cause the "abusive head injury" alleged in the aggravated assault count did not provide him

---

[3] OCGA § 16-5-20 (a) provides that "[a] person commits the offense of simple assault when he or she either: (1) Attempts to commit a violent injury to the person of another; or (2) Commits an act which places another in reasonable apprehension of immediately receiving a violent injury."

12

adequate notice of what he had to defend against at trial. And, noting our precedent holding that only a felony that is "inherently dangerous" or "life-threatening" can be a predicate felony for a felony murder charge, *Eberhart v. State*, 307 Ga. 254, 262 (835 SE2d 192) (2019) (citation and punctuation omitted), Hinkson contends that the indictment had to, but did not, put him on notice of the circumstances that made the assault on Alexander inherently dangerous or life-threatening. We disagree with these contentions.

Contrary to Hinkson's contention that the trial court should have granted his special demurrer to this count of the indictment because it did not contain sufficient information about the type of simple assault that he is alleged to have committed, we have held that an indictment under OCGA § 16-5-21 (a) (2) "need not specify the manner in which the defendant committed the simple assault, when that is a lesser included offense within the greater offense of aggravated assault." *State v. Wyatt*, 295 Ga. 257, 261 (759 SE2d 500) (2014) (citation and punctuation omitted). Instead, "[a]n indictment charging aggravated assault must allege the element

13

that aggravates the crime above a simple assault," id., which, in this case, was the use of objects (hands), "which, when used offensively against a person . . . actually does result in serious bodily injury[.]" OCGA § 16-5-21 (a) (2). Accordingly, the trial court did not err in denying the special demurrer on this ground.

Hinkson also contends that the aggravated assault count failed to provide him notice of what he had to defend against at trial because it did not adequately allege the manner in which he used his hands to cause the "abusive head injury" alleged in the aggravated assault count. Again, we disagree.

We have held that an

> indictment need not say how the defendant used the weapon or object that aggravated the assault. See, e.g., *Arthur v. State*, 275 Ga. 790, 791 (573 SE2d 44) (2002) (affirming the denial of a special demurrer because, "by alleging [the defendant's] general use of a gun, the State apprised him that he would have to defend against all of the possible ways of committing the assault that he himself had admitted in his statement"); *Watson v. State*, 178 Ga. App. 778, 780 (344 SE2d 667) (1986) (concluding that an indictment charging that the defendant assaulted the victim "with a metal pipe," without specifying how the pipe was used, was sufficient).

*Wyatt*, 295 Ga. at 261-262. In *Wyatt*, in which the defendant was charged with committing an aggravated assault with an unknown object, "which when used offensively against another person is likely to result in serious bodily injury," we held that the indictment was sufficient to withstand the defendant's challenge "that the lack of detail about the dangerous object he allegedly used and the manner in which he used it le[ft] him without adequate notice of what he [had to] defend against at trial." Id. at 261 (punctuation omitted). We held that the indictment provided sufficient notice to the defendant to prepare a defense because it told him that "he used an object that is likely to result in serious bodily injury when used offensively to fatally injure [the child] by causing damage to her brain" and that the State "claim[ed] not to know — and thus d[id] not intend to prove — what specific object he used to assault" the child. Id. at 263.[4] Here, we likewise conclude that the indictment

---

[4] Accord *Hester v. State*, 283 Ga. 367, 368 (659 SE2d 600) (2008) (holding that the felony murder count of an indictment that alleged that the defendant caused the victim's death "by striking her on and about the head with a lamp" and an aggravated assault count that alleged that the defendant assaulted the

15

provided Hinkson with adequate notice of what he had to defend against at trial by telling him that he used his hands in an offensive manner against his eight-month-old son and that he caused his son "an abusive head injury" in doing so. This contention regarding the indictment therefore fails.

Finally, Hinkson's contention that the indictment was subject to a special demurrer because it did not allege the attendant circumstances to put him on notice of how the assault was "inherently dangerous" or "life-threatening," *Eberhart*, 307 Ga. at 262, is waived because he did not raise this objection to the

---

victim "with a lamp, an object which when used offensively against a person, is likely to and actually does result in serious bodily injury" were not subject to a special demurrer on the ground that they failed "to specify how the lamp was used," concluding that the defendant "clearly was apprised that she would have to defend against the allegation that she struck [the victim] on and about the head with the lamp"); *Arthur*, 275 Ga. at 791 (holding that an aggravated assault count that alleged that Arthur assaulted the victim "with a handgun, a deadly weapon" was sufficient to withstand Arthur's claim in his special demurrer that the indictment failed to provide adequate notice because it lacked specific allegations as to whether the defendant committed the crime by "'shooting at (the victim), pointing the gun at him, beating him with the gun, or any other manner in which a handgun could be used to assault a person'"). See also *Kimbrough v. State*, 300 Ga. 878, 881 (799 SE2d 229) (2017) (explaining that "an indictment does not have to contain 'every detail of the crime' to withstand a special demurrer") (citation omitted).

indictment until his purported second amended motion for new trial. See *Miller v. State*, 305 Ga. 276, 281 (824 SE2d 342) (2019) (a special demurrer claim "must be brought before trial, or it is waived").

For these reasons, the trial court did not err in denying Hinkson's special demurrer to Counts 2 and 3 of the indictment.

4. Hinkson also claims that the trial court erred in denying his general demurrer to Counts 2 and 3 of the indictment. We again disagree.

A general demurrer "challenges the sufficiency of the substance of the indictment." *Kimbrough*, 300 Ga. at 880 (citation, punctuation and emphasis omitted). An indictment that simply alleges a violation of a Code section but does not "set out all the elements of the offense" or "allege all the facts necessary to establish" a violation of the Code section is insufficient to withstand a general demurrer. *State v. Mondor*, 306 Ga. 338, 341 (830 SE2d 206) (2019) (citation and punctuation omitted).

> On the other hand, if an indictment does "recite the language of the statute that sets out all the elements of the offense charged" or "allege the facts necessary to

17

establish violation of a criminal statute," then the indictment is sufficient to withstand a general demurrer because "the accused cannot admit the allegations of the indictment and yet be not guilty of the crime charged." Indeed, we have before explained that "[t]he true test of the sufficiency of an indictment" to withstand a general demurrer is "'[i]f all the facts which the indictment charges can be admitted, and still the accused be innocent, the indictment is bad; but if, taking the facts alleged as premises, the guilt of the accused follows as a legal conclusion, the indictment is good.'"

Id. at 341 (citations omitted).

Hinkson contends that the aggravated assault count of the indictment (and therefore its corresponding felony murder count) was insufficient to withstand his general demurrer because it failed to specify that his hands, "when used offensively against a person," were "*likely to* . . . result in serious bodily injury[.]" OCGA § 16-5-21 (a) (2) (emphasis supplied).

Hinkson's contention, however, fails. Although an allegation that Hinkson's hands were "likely to . . . result in serious bodily injury[,]" id., would satisfy an essential element of aggravated assault, Hinkson errs by contending that his indictment had to contain that language. An indictment under OCGA § 16-5-21 (a) (2)

18

must allege the "element that aggravates the crime above a simple assault." *Wyatt*, 295 Ga. at 261. But that aggravating element may be that the assault was committed either "with a deadly weapon *or* an object that was likely to *or* actually did result in serious bodily injury." Id. at 262 (emphasis supplied). Hinkson's indictment alleged that he committed an aggravated assault by assaulting his son with objects (his hands) that actually did "result in serious bodily injury." The fact that it did not also allege that the use of his hands was likely to result in serious bodily injury was not a successful ground for a general demurrer.

Pointing to *Smith v. Hardrick*, 266 Ga. 54 (464 SE2d 198) (1995), Hinkson contends that the trial court erred in denying his general demurrer because his indictment, like that in *Hardrick,* did not properly allege the grounds of the simple assault or the aggravating element. *Smith*, however, does not control this case. The indictment in that case charged the defendant "with the offense of AGGRAVATED ASSAULT for (he) did make an assault upon (the victim) by placing his hands around (her) neck and using his hands

19

to apply pressure to her neck contrary to the law( )." Id. at 54. There, we noted that the indictment failed to allege any aggravating element and failed to allege how the simple assault was committed, and we concluded that the trial court should have granted the defendant's general demurrer. In other words, the defendant could have admitted the facts alleged in the indictment and not been guilty of the crime charged. Id. at 56. See also *Mondor,* 306 Ga. at 341.

Here, by contrast, the indictment, as discussed above, clearly alleged the aggravating element of the assault charge. Moreover, we have explained on several occasions after our decision in *Hardrick* that, although an aggravated assault charge must allege the aggravating element, it need not allege how the simple assault was committed. See, e.g., *Bullard,* 307 Ga. at 487 ("an indictment for aggravated assault need not specify the manner in which the simple assault was committed"); *Wyatt*, 295 Ga. at 261 ("an indictment under OCGA § 16-5-21 (a) (2) 'need not . . . specify the manner in which the defendant committed the simple assault, when

20

that is a lesser included offense within the greater offense of aggravated assault'") (quoting *Simpson v. State*, 277 Ga. 356, 358 (589 SE2d 90) (2003)). Furthermore, in *State v. English*, 276 Ga. 343 (578 SE2d 413) (2003), a case in which the aggravated assault count of the indictment did not allege the manner in which the simple assault was committed, but did allege the aggravating element, we distinguished *Hardrick* and held that English, unlike Hardrick, could not have pled guilty to the aggravated assault count and not been admitting to an aggravated assault. See *English*, 276 Ga. at 344. So, although *Hardrick* was correctly decided based on the failure of the indictment there to allege any aggravating element, it is not controlling in this case.

Hinkson also contends that the indictment had to, but did not, allege facts that showed that the assault he committed was dangerous per se or created a foreseeable risk of death. To support this argument, he again relies on the proposition that only a felony that is "inherently dangerous" or "life-threatening" can be a predicate felony for a felony murder charge. *Eberhart*, 307 Ga. at

21

262. He argues that he therefore could admit the facts alleged in the indictment and not be guilty of an aggravated assault.

This issue is not preserved for review. Unlike a special demurrer, which is waived if not "brought before trial," *Miller*, 305 Ga. at 281, we have held that a count of an indictment which is subject to a valid general demurrer is void, and we have explained that "a general demurrer may be raised after jeopardy has attached and at any time during trial," as well as "in the form of a motion in arrest of judgment after a verdict in the same term of court." *State v. Heath*, 308 Ga. 836, 840 & n.2 (843 SE2d 801) (2020). Hinkson first raised this general demurrer issue in his purported second amended motion for new trial. That motion, however, was not timely as an amendment to Hinkson's motion for new trial because it was filed after the trial court denied Hinkson's motion for new trial. See OCGA § 5-5-40 (b) (providing that a motion for new trial "may be amended any time on or before the ruling thereon"). Moreover, even treating Hinkson's motion as a motion in arrest of judgment, we cannot address the merits of the motion because it was

not timely filed. "A motion in arrest of judgment must be filed within the term of court in which the judgment was rendered. OCGA § 17-9-61 (b)." *Dasher v. State*, 285 Ga. 308, 310 (676 SE2d 181) (2009). The terms of court for the Superior Court of Muscogee County begin on the "[f]irst Monday in February, April, June, August, October, and December." OCGA § 15-6-3 (8) (D). Hinkson's sentence was entered during the August 2015 term of court, and his "motion in arrest of judgment" was filed in January 2019, well after the deadline for filing a motion in arrest of judgment. Accordingly, the issue is not preserved for review.

5. Hinkson contends that the trial court erred in denying his motion to suppress evidence of the recorded statement he made to Detective Tyner at the police station. More specifically, Hinkson contends that his statement should have been suppressed because it was the fruit of an unlawful arrest and because he was not properly advised of his rights under *Miranda v. Arizona*, 384 U.S. 436 (86 SCt 1602, 16 LE2d 694) (1966). We conclude that there is no merit to either contention.

23

(a) We turn first to Hinkson's contention that his statement should have been suppressed because he was under arrest at the time of his interview and his arrest was not supported by probable cause.[5] The State does not contest Hinkson's claim that he was under arrest at the time of his interview,[6] but contends that Hinkson's arrest was supported by probable cause. If the State is correct about probable cause, the trial court did not err in admitting Hinkson's statement. See *Devega v. State*, 286 Ga. 448, 451 (689 SE2d 293) (2010) ("Where probable cause exists, even an illegal,

---

[5] "In addition to arguing that suppression was required by the Fourth Amendment, [Hinkson] also relies on OCGA § 17-4-20 and Article I, Section I, Paragraph XIII of the Georgia Constitution." *White v. State*, 307 Ga. 601, 602 n.2 (837 SE2d 838) (2020). However, Hinkson

> makes no argument that state law provides a rule substantively different as applied to this case from that of the Fourth Amendment. This case therefore presents no occasion for consideration of whether Paragraph XIII differs from the Fourth Amendment in some circumstances. See *Olevik v. State*, 302 Ga. 228, 234 (2) (b) n.3 (806 SE2d 505) (2017) (noting that the United States Supreme Court's construction of the Fourth Amendment does not bind our construction of Paragraph XIII, and that any independent interpretation of Paragraph XIII must be grounded in the text, context, and history of the Georgia provision).

*White*, 307 Ga. at 602 n.2.

[6] The record shows that Hinkson was driven to police headquarters in handcuffs and that, at the time of the interview, he was shackled and handcuffed using a "belly chain."

warrantless arrest in a suspect's home does not render inadmissible subsequent statements made outside the premises.") (citation and punctuation omitted).  For the reasons that follow, we conclude that the arrest was supported by probable cause.

> "[P]robable cause" to justify an arrest means facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense.

*Westbrook v. State*, 308 Ga. 92, 95 (839 SE2d 620) (2020) (citation and punctuation omitted).  In denying Hinkson's motion to suppress, the trial court made no specific findings of fact regarding probable cause, but the facts were largely undisputed and included an account of events outlined by defense counsel.  We will therefore review de novo the trial court's "application of the law to [those] undisputed facts."  *Williams v. State*, 302 Ga. 474, 480 (807 SE2d 350) (2017) (citation and punctuation omitted).

Here, those facts showed that Detective Tyner knew that Alexander arrived at the hospital with a severe brain injury and that

25

he had been alone with Hinkson at the time of the injury. Moreover, he knew that Hinkson had told Jennifer "he had done something to the child, and that the child wasn't acting right." The detective was also told that Hinkson might try "to do harm to himself." Finally, the detective knew that Hinkson had gone to see an Army chaplain and that military police had turned Hinkson over to the Columbus Police Department. The trial court could properly conclude that when Detective Tyner detained Hinkson knowing the foregoing information, the detective had probable cause to arrest him. See *White v. State*, 307 Ga. 601, 602-603 (837 SE2d 838) (2020) (holding that probable cause existed for a warrantless arrest based on statements by the defendant's grandfather that the defendant "had behaved oddly after the murder" and by another family member that the defendant had said that he killed the victim); *Stinski v. State*, 281 Ga. 783, 785 (642 SE2d 1) (2007) (holding that probable cause existed for the defendant's arrest because "officers had been informed by other residents in the home where [the defendant] was living that he had admitted killing the victims").

26

(b)    Hinkson also contends that the trial court erred in concluding that he knowingly and intelligently waived his *Miranda* rights.  We disagree.

"To use a defendant's custodial statements in its case-in-chief, the State must show that the defendant was advised of his *Miranda* rights and that he voluntarily, knowingly, and intelligently waived them." *Wells v. State*, 307 Ga. 773, 776 (838 SE2d 242) (2020).  "Only if the totality of the circumstances surrounding the interrogation reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived."   *Young v. State*, 309 Ga. 529, 534 (847 SE2d 347) (2020) (citation and punctuation omitted).  Moreover, "[a] statement by an interrogating agent that contradicts the *Miranda* warnings is a circumstance that can indicate a suspect did not knowingly and intelligently waive his rights."   Id. (citation and punctuation omitted).

> Generally, when reviewing a trial court's ruling on a motion to suppress, this Court must accept the trial court's factual findings unless they are clearly erroneous.

27

However, when, as here, [t]here is no dispute about what took place during the police interview in question, since it was recorded with both video and audio and when [t]he recording is part of the record on appeal, and the parties point to no evidence beyond the recorded interview to support their arguments regarding the admissibility of [a] confession, we review de novo the trial court's determinations of both fact and law.

*Dozier v. State*, 306 Ga. 29, 33 (829 SE2d 131) (2019) (citations and punctuation omitted).

Here, the record shows that Detective Tyner read Hinkson the required *Miranda* warnings, including the warning that Hinkson had the right to remain silent. Hinkson acknowledged that he understood those rights. Immediately after reading Hinkson his rights, Detective Tyner orally informed Hinkson that he could waive those rights, explaining that

> I got a waiver here that I want to read to you also. It says I've read or had read to me the above rights and understand what my rights are. I'm willing to make a statement and answer questions without having a lawyer present at this time. I understand and know what I'm doing. No promises or threats have been made to me. No pressure, coercion of any kind has been used against me. You understand all that Mr. Hinkson?

Hinkson acknowledged that he understood the waiver of his rights.

Detective Tyner then said: "If you, um, you want to talk to us now, I appreciate it if you, ah, would just sign your name here. Ah, which basically just says you've been advised of your rights, has no bearing on anything else." Hinkson then signed his name and talked with Detective Tyner. At the hearing on the motion to suppress, Tyner testified that Hinkson did not appear to be under the influence of drugs, alcohol, or any other substance when he spoke with him.

Hinkson argues that, when Tyner told him that where he was to sign "basically just says you've been advised of your rights, has no bearing on anything else," Detective Tyner vitiated his *Miranda* rights by leading him to believe, mistakenly, that he was not waiving those rights by signing his name and speaking with Detective Tyner. Assessing the totality of the circumstances in the case, we disagree.

Detective Tyner correctly informed Hinkson of his *Miranda* rights and explained that Hinkson could waive those rights and speak with the detectives. Hinkson orally acknowledged that he

29

understood his rights. He also said that he understood the waiver form that was read to him, which stated that, understanding his rights, he could effectively waive them by speaking with the detective. Moreover, when Detective Tyner told Hinkson that if he wanted to speak with Detective Tyner, he needed to sign a form that "basically just says you've been advised of your rights, has no bearing on anything else," that did not diminish the fact that Hinkson said that he understood the *Miranda* warnings that were given to him orally and understood that he could, but did not have to, speak with Detective Tyner. Even if Hinkson thought, as he asserts, that he was signing a form acknowledging that he had been read his rights, as opposed to a form acknowledging that he was waiving his rights, that would only show that Detective Tyner did not obtain an express waiver of rights from Hinkson. However, it is well established "[t]he prosecution . . . does not need to show that a waiver of *Miranda* rights was express." *Berghuis v. Thompkins*, 560 U.S. 370, 384 (130 SCt 2250, 176 LE2d 1098) (2010). "Where the prosecution shows that a *Miranda* warning was given and that it

was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent."  Id.

Moreover, this case is not like others in which this Court has concluded that a statement by an officer vitiated *Miranda* warnings that were previously given.  See *State v. Clark*, 301 Ga. 7, 12 (799 SE2d 192) (2017) (holding that after a detective had read the defendant his *Miranda* rights and the defendant stated his belief that the ensuing interview would be "off the record," the detective's affirmative response to the defendant's statement had the effect of nullifying the *Miranda* warning previously given to the defendant); *Spence v. State*, 281 Ga. 697, 699-700 (642 SE2d 856) (2007) (holding that when an officer informs a defendant of his *Miranda* rights, but then tells him that the defendant's interview would be kept confidential, the defendant's statement is inadmissible).[7]

---

[7] Furthermore, this case is unlike *Benton v. State*, 302 Ga. 570 (807 SE2d 450) (2017), on which Hinkson relies.  There, an officer informed the defendant of his *Miranda* rights and asked the defendant if he understood them.  See id. at 573.  The defendant's response indicated that he "did not understand the *Miranda* warnings as read to him initially," and the officer's subsequent attempt to explain those warnings was "inadequate because it failed to include

For these reasons, we conclude that the trial court did not err in concluding that Hinkson made a knowing and intelligent waiver of his *Miranda* rights.

6. Hinkson contends that his Fourth Amendment rights were violated by the search of his apartment and that the trial court therefore erred in denying his motion to suppress evidence of the gun that the police found. However, even if the trial court did err, we conclude that any error was harmless beyond a reasonable doubt. See *Ensslin v. State*, 308 Ga. 462, 471 (841 SE2d 676) (2020) (a constitutional error "may be deemed harmless if the State can prove beyond a reasonable doubt that the error did not contribute to the verdict") (citation and punctuation omitted).

First, the gun itself was not admitted into evidence at trial; instead, Detective Tyner simply testified that he found the gun in

---

three of the four *Miranda* warnings." Id. at 574. "Because the interrogating officer's subsequent explanation of those warnings was incomplete," we held that "we cannot say that [the defendant] knowingly and intelligently waived his rights under *Miranda*." Id. at 575. Here, unlike in *Benton*, Detective Tyner accurately explained the *Miranda* warnings, and Hinkson indicated that he understood them.

the apartment and that it had one bullet in it. Moreover, evidence that the gun was found in the apartment was cumulative of Hinkson's own statement that he was holding a gun when Jennifer came to the apartment and of Jennifer's testimony that he was pointing the gun at his head when she arrived at the apartment. In addition, the evidence of Hinkson's guilt, including Hinkson's statement, Jennifer's testimony, and the medical evidence introduced at trial, was strong. For these reasons, we conclude that any error in permitting Detective Tyner to testify regarding the gun was harmless beyond a reasonable doubt. See *Ensslin*, 308 Ga. at 472-474 (holding that the erroneous admission of evidence was harmless beyond a reasonable doubt because of overwhelming evidence against the defendant and because the evidence was cumulative of other evidence admitted at trial); *Jordan v. State*, 307 Ga. 450, 453 (836 SE2d 86) (2019) (holding that even if evidence should not have been admitted, "it was cumulative of other (properly admitted) evidence" and "was harmless beyond a reasonable doubt"); *McCord v. State*, 305 Ga. 318, 324 (825 SE2d 122) (2019) (holding

that even if the trial court erred in admitting certain evidence, the error was harmless beyond a reasonable doubt because of the strength of the evidence against the defendant and because the evidence was cumulative of other evidence admitted at trial).

*Judgment affirmed. All the Justices concur.*

Decided October 19, 2020 —Reconsideration denied November 16, 2020.

Murder. Muscogee Superior Court. Before Judge Land.
*L. David Wolfe*, for appellant.
*Julia F. Slater, District Attorney, William D. Hocutt IV, Assistant District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Kathleen L. McCanless, Assistant Attorney General*, for appellee.