317 Ga. 563
FINAL COPY

S23A0519.  EUBANKS v. THE STATE.

PINSON, Justice.

Jessica Eubanks lived with her boyfriend, Shawn Hughes, and Shawn's sister, Amy Hughes, who had severe developmental disabilities. Eubanks used heroin and methamphetamine and kept a large supply of heroin in the home. One evening when Shawn was out, Eubanks invited two people to the home to buy heroin. During the transaction, which she conducted in the main part of the home, some of the drug spilled "all over the place" and Eubanks tried to clean it up. Then she went out, leaving Amy home alone. The next morning Amy was found dead of heroin toxicity. After a jury trial, Eubanks was convicted of felony murder.[1]

---

[1] Amy died on the night of June 22-23, 2019. On March 9, 2020, a Forsyth County grand jury indicted Eubanks for felony murder predicated on possession of heroin with intent to distribute (Count I), possession of heroin with intent to distribute (Count II), felony murder predicated on possession of heroin (Count III), possession of heroin (Count IV), and two counts of possession of drug related objects (Counts V and VI).Eubanks pled not guilty and proceeded

On appeal, Eubanks contends that (1) the evidence was insufficient to support her convictions for felony murder because the predicate felony—possession of a controlled substance with intent to distribute—was not inherently dangerous and did not proximately cause Amy's death; (2) the trial court erred by failing to instruct the jury about circumstantial evidence, intent, accident, proximate cause, criminal negligence, and the requirement that a predicate crime for felony murder be inherently dangerous; (3) the trial court should have granted her special demurrer because the indictment lacked enough detail about the manner in which her possession or distribution of heroin caused Amy's death; (4) the trial court erred by admitting a hearsay statement in which Amy said that Eubanks

---

to a jury trial, which was held from August 9 through August 13, 2021. Eubanks was convicted on all counts. She was sentenced to life in prison on Count I and 12 months in prison on each of Counts V and VI, all to be served concurrently. The remaining counts merged with Count I or were vacated by operation of law. Through new counsel, Eubanks filed a timely motion for new trial on August 13, 2021, which she amended on August 4, 2022. The trial court denied the motion on October 17, 2022.Eubanks filed a timely notice of appeal on October 28, 2022. The case was docketed to the April 2023 term of this Court and orally argued on May 17, 2023.

was "mean" to her; and (5) the trial court erred by admitting a collection of videos showing Amy in life.

Although Eubanks's conviction tests the limits our felony-murder statute places on that offense, we conclude based on our precedent and the unusual facts of this case that the evidence was sufficient to authorize her conviction. Eubanks's possession of heroin with intent to distribute was dangerous to human life under the circumstances of this case because it was foreseeable that keeping a large amount of a deadly drug in a home where a highly vulnerable person lived, and engaging in drug transactions in areas that person could freely access, could lead to that person being fatally exposed to the drug. See *Williams v. State*, 298 Ga. 208, 213 (2) (b) (779 SE2d 304) (2015) (jury was authorized to find that defendants who kept supply of crack cocaine "inside a hole in the living room sofa" that their young child could access created a foreseeable risk of death and thus was authorized to find defendants guilty of felony murder based on possession of cocaine with intent to distribute after the child ingested the cocaine and died). The evidence authorized the

3

jury to conclude that just such an exposure, while Amy was left home alone for hours with access to where Eubanks had spilled the heroin during a drug transaction, was the proximate cause of her death. And the evidence also authorized the jury to conclude that Amy's death was caused in the commission of the predicate felony, because on the night Amy was fatally exposed to the heroin, Eubanks still constructively possessed the drug in the home with the intent to distribute it.

Eubanks's remaining claims fail, too. The trial court did not err by failing to give the jury instructions that Eubanks now urges, because those instructions either were not warranted in this case or addressed points of law that were substantially covered by other instructions. The indictment was constitutionally sufficient because it informed Eubanks of the facts she must meet at trial—that she caused Amy's death by exposing her to heroin on June 23, 2019, in the course of either possessing the drug or distributing it—and allowed her to intelligently prepare her defense. Any error in admit-

4

ting Amy's hearsay statement was harmless because it was cumulative of other evidence and did not support the State's theory of the case. Finally, the "in-life" videos of Amy were probative evidence of her vulnerable state, and their probative value was not substantially outweighed by any danger of unfair prejudice.

Because Eubanks's claims of error fail, we affirm her convictions and sentence.

1. Amy was a 40-year-old woman with Down syndrome and an IQ of 42. She needed help with certain basic life activities and was not able to live on her own, so she lived with her brother, Shawn. Shawn's girlfriend, Eubanks, also lived in their home.

On the morning of June 22, 2019, Shawn went to the home of some friends, the Millers, to help care for their children while they were away. The plan was for Shawn to stay at the Millers' house from 9:00 a.m. on June 22 until around noon on June 23. Eubanks would stay home with Amy on the morning of June 22, and then in the afternoon would bring Amy to the Millers' house, where Amy would stay the night with Shawn.

But Eubanks never brought Amy to the Millers' home. Instead, Eubanks stayed at Shawn's home with Amy throughout the afternoon of June 22 and into the evening. In the early evening, Eubanks invited a couple, Paul and Crystal (whose last names were not given), to the home to buy some heroin from her. While Paul and Crystal were in the common area of the home, Eubanks went into the bathroom to inject some heroin herself. When she came out, Paul had "the whole bundle" of Eubanks's heroin in his hand—much more than he and Crystal had agreed to buy. Eubanks fought with Paul, and the bag of heroin broke. The drug "went flying all over the place." Eubanks tried to clean it up.

That same evening, a next-door neighbor, Matthew Rogers, went over to Shawn's house to let him know that Shawn's dog was running loose in the rain. Rogers could see through a glass panel on the front door that the light was on in the living room and that papers were spread out on the floor in an unusual pattern. Nobody answered the door when Rogers first knocked, but Rogers saw someone poke their head out from the hallway, and then the lights went out.

Rogers returned to his own home and contacted Shawn, who told him that he (Shawn) was not home but that Eubanks was. Rogers then returned to the Hugheses' home at around 10:30 or 11:00 p.m., with his girlfriend, Michelle Clark, to try to return the dog. This time, Eubanks answered the door. Rogers testified that Eubanks was speaking in a "soft," "dreamy" tone and that her eyes were glassy. He returned the dog and then he and Clark went back to their own house.

Later on the night of June 22, Eubanks left to join Shawn at the Millers' home. She did not bring Amy with her. When she arrived, she told Shawn that Amy was asleep and that she had not wanted to wake her. She also told Shawn about the altercation with Paul and Crystal, and that some drugs had been "spilled on the table," but she had "cleaned it all up." Shawn told Eubanks she had to go home to be with Amy. Shawn then fell asleep on the Millers' couch while Eubanks was still there.

The next morning, on June 23, Shawn woke up at the Millers' house to find that Eubanks was there, without Amy. He did not

think Eubanks had ever left, but Eubanks said later that she went home and then came back before Shawn woke up. The two of them waited for the Millers to come home, and then returned to Shawn's house. When they got home, Shawn found Amy lying on the floor of her room. Her color "wasn't good," she was not breathing, and she was unresponsive. Shawn called 911, but he testified that he knew Amy was already dead.

At around 1:00 p.m., Forsyth County Sheriff's deputies were dispatched to the Hughes home. They found Amy lying on her back, unresponsive and with no pulse. There was no evidence of trauma to Amy's body and no immediate indication of how she had died.

One of the deputies interviewed Eubanks. Eubanks seemed nervous and emotional. She told the deputy that she had last seen Amy the previous evening, before she went to the Millers' house, and then again when she returned later that night (after Shawn fell asleep) between midnight and 1:00 a.m. Eubanks said that Amy had been complaining of dizziness. The deputies concluded that Amy had died of natural causes and left after 15 or 20 minutes. The coroner

on the scene, however, requested an autopsy given Amy's relatively young age and her sparse medical history.

About an hour later, the deputies were dispatched back to Shawn's house for a domestic disturbance. They found Eubanks and Shawn arguing in the front yard. On this second call, Eubanks's demeanor was quite different. She seemed paranoid, could not sit still, and continually brushed her hair out of her face. Deputies believed she was under the influence of drugs.

Eubanks consented to a search of her room for drugs or drug paraphernalia. Deputies found syringes, spoons, and a powdery substance wrapped in foil. The spoon had a residue on it that was later identified as heroin. Eubanks acknowledged that she used heroin and methamphetamine, but she denied using any drugs that day. The deputies did not make any arrests. However, one of the deputies made a second request for an autopsy after seeing Eubanks's strange behavior and hearing reports that Amy had complained that Eubanks was "mean" to her.

That same day, Shawn asked Eubanks to move out of his

house. She went to stay with her ex-husband, Kelly Durden, for a few days. Right after Durden picked her up, Eubanks told him about the night Amy died. Eubanks told Durden that "she had bought a large quantity of heroin to resell to make some of Shawn's money back that she had been taking out of his account little by little." She described the altercation with Paul and Crystal, and she told him she thought that Amy had eaten some of the heroin that she had spilled during the struggle—that she had tried to clean it up, but she "kept insisting that she was pretty sure that's what happened." Durden contacted Shawn and told him that if Amy's autopsy revealed the presence of any toxins, he "might have some information."

About a week after Amy died, Shawn's next-door neighbors, Rogers and Clark, along with another friend, went over to Shawn's house to help Shawn clean up and remove Eubanks's belongings. Among Eubanks's things, they found a black bag containing needles, a powder substance, and other drug paraphernalia, and Shawn reported these findings to the police. The powder substance was later determined to be heroin.

Several weeks later, the toxicology report from Amy's autopsy showed that her cause of death was heroin toxicity. It was undetermined from the toxicology report how much heroin Amy took or how it got into her system. Police told Shawn, who referred them to Kelly Durden. Durden, in turn, recounted to police Eubanks's story about the attempted drug deal with Paul and Crystal and the spilled heroin. Eubanks was arrested and charged with Amy's death.

2. Eubanks contends that the evidence was insufficient as a matter of constitutional due process to support her conviction for felony murder. See *Jackson v. Virginia*, 443 U.S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979). We evaluate a due process challenge to the sufficiency of the evidence by viewing the evidence presented at trial in the light most favorable to the verdicts, and asking whether any rational trier of fact could have found the defendant guilty beyond a reasonable doubt of the crimes of which she was convicted. See *Peacock v. State*, 314 Ga. 709, 714 (2) (b) (878 SE2d 247) (2022). The "resolution of conflicts or inconsistencies in the evidence, credibility of witnesses, and reasonable inferences to be derived from

11

the facts" are left to the jury. *Perkins v. State*, 313 Ga. 885, 891 (2) (a) (873 SE2d 185) (2022) (citation and punctuation omitted).

Eubanks's contentions about sufficiency center on certain limitations on felony murder related to causation and foreseeability, which are grounded in our felony-murder statute and our decisions construing and applying it. To address her contentions, we first review that law, and then we apply it to her case.

(a) *Legal Principles*

A person commits felony murder when, "in the commission of a felony, he or she causes the death of another human being irrespective of malice." OCGA § 16-5-1 (c). From this statutory language, our decisional law has identified certain related prerequisites the State must establish to convict a defendant of felony murder. Eubanks's sufficiency arguments touch on three of these: First, the predicate felony the defendant committed must be one from which it was reasonably foreseeable that death could result. We have described this as a requirement that the predicate felony was "inherently dangerous." Second, the death must have been the probable or

natural consequence of the defendant's conduct, a concept known as "proximate cause." Third, in keeping with the statutory language, the death must have been caused "in the commission of" the predicate felony. Because our decisions have sometimes commingled these related-but-distinct concepts, we briefly describe each of these requirements in turn.

(i) *Inherently Dangerous*

The first requirement—that a felony must be "inherently dangerous to human life"—is a "limitation on the type of felony that may serve as an underlying felony for a felony murder conviction." *Hulme v. State*, 273 Ga. 676, 678 (1) (544 SE2d 138) (2001), overruled in part on other grounds by *State v. Jackson*, 287 Ga. 646 (697 SE2d 757) (2010). This Court has reasoned that the "only rational function" of the felony-murder statute is to "deter the commission of a dangerous or life-threatening felony." *Ford v. State*, 262 Ga. 602, 603 (1) (423 SE2d 255) (1992) (citation and punctuation omitted). In line with this reasoning, we have held that a felony cannot serve as a

predicate for felony murder unless it is "inherently dangerous to human life." *Wilson v. State*, 315 Ga. 728, 733 (4) (883 SE2d 802) (2023) (citation and punctuation omitted).

Felonies may be considered inherently dangerous if they either are "dangerous per se," or "by [their] circumstances create[ ] a foreseeable risk of death." *Wilson*, 315 Ga. at 733 (4) (citation and punctuation omitted); see *Davis v. State*, 290 Ga. 757, 760 (4) (725 SE2d 280) (2012). Some felonies, like aggravated assault, create a foreseeable risk of death under almost any circumstances. See *Sanders v. State*, 313 Ga. 191, 198-199 (3) (a) (iv) (869 SE2d 411) (2022); see also, e.g., *Lofton v. State*, 309 Ga. 349, 353 (1) (846 SE2d 57) (2020) (armed robbery); *State v. Tiraboschi*, 269 Ga. 812, 813 (504 SE2d 689) (1998) (felony fleeing). Others may or may not create a foreseeable risk of death, depending on how they were committed. See *Ford*, 262 Ga. at 603 (1) (explaining that possession of a firearm by a previously convicted felon is not dangerous per se, but that "circumstances may well exist under which such a felony may be considered dangerous").

14

(ii) *Proximate Cause*

The second requirement, proximate cause, comes from the statutory requirement that the person "*causes* the death" in the commission of a felony, OCGA § 16-5-1 (c) (emphasis added), and focuses on the causal connection between the criminal conduct and the victim's death. Proximate cause is distinct from the requirement that the felony be inherently dangerous. As just explained, a felony is inherently dangerous if it is committed in such a way that death is a reasonably foreseeable consequence. See *Wilson*, 315 Ga. at 733 (4). Proximate cause additionally requires that the death *actually happened* in a way that was a reasonably foreseeable result of the criminal conduct—that is, the death must also have been a "probable or natural consequence[ ]" of the criminal conduct. See *Calhoun v. State*, 308 Ga. 146, 149 (2) (a) (839 SE2d 612) (2020) (citation and punctuation omitted); *Jackson*, 287 Ga. at 648-652 (2). See also Wayne R. LaFave, 2 Subst. Crim. L. § 14.5 (d) (3d ed.) ("A given category of felony may be inherently dangerous, but it may still be that

15

the death which actually occurred has come about in such an extraordinary way that as a matter of causation the defendant should not be held accountable for the death.").

Take armed robbery. Committing armed robbery with a gun is inherently dangerous because it is reasonably foreseeable that someone will be shot and killed in the course of the robbery. See *Lofton*, 309 Ga. at 353 (1). If the victim was in fact shot and killed by the defendant in the course of the robbery, proximate cause is also satisfied, because one could reasonably foresee that a death could be caused by an armed robbery in just that way. See, e.g., *Perez v. State*, 316 Ga. 433, 438 (2) (888 SE2d 526) (2023) (defendant guilty of felony murder based on armed robbery when he shot the victim during the robbery). If, on the other hand, someone dies because he tried to flee from the ongoing robbery by climbing from his third-floor balcony to the balcony below, slipped, and fell thirty feet to the ground, proximate cause would be a closer question. See *Stafford v. State*, 312 Ga. 811 (865 SE2d 116) (2021) (affirming conviction for felony murder predicated on burglary under those circumstances

16

where defendant did not challenge sufficiency of the evidence). In that case, the defendant would be guilty of felony murder only if the "intervening act"—the victim fleeing from his balcony and falling—could "reasonably have been anticipated, apprehended, or foreseen by the original wrong-doer." *Calhoun*, 308 Ga. at 149 (2) (a) (citation and punctuation omitted).[2]

What sorts of intervening acts are reasonably foreseeable?[3]

---

[2] A notable treatise explains proximate cause through the lens of arson:
[I]t is clear that if A sets fire to B's occupied house it is felony-murder if B or a member of his household or a fireman fighting the blaze is burned to death. While the chances may be all in favor of no one's death by fire, these deaths are neither unforeseeable nor the result of abnormal happenings. Firemen usually put out house fires without getting killed, but the death of a fireman fighting such a blaze happens often enough that its occurrence does not greatly surprise us. So too we would not view it as abnormal if a brave stranger were to rush into the house in an attempt to save a trapped member of B's household crying for help at an upstairs window, and if the stranger died in the fire this would also be felony murder. On the other hand, it seems unlikely that the arsonist would be held guilty of felony murder if a looter entered the blazing building to steal whatever he could find or if a fireman were to fall off the fire truck on its way back to the fire station after putting out the conflagration.
Wayne R. LaFave, The "proximate" or "legal" cause limitation, 2 Subst. Crim. L. § 14.5 (d) (3d ed.).

[3] The idea of an "intervening act," as we use that term here, is distinct from that of an "intervening cause," at least as that term is used in tort law. In tort law, an intervening cause, by definition, is an event that is *not* foreseeable

17

Generally, an intervening act is reasonably foreseeable if, among other things, it "may ensue in the ordinary course of events," *Jackson*, 287 Ga. at 651 (2) n.4 (quoting *Cain v. State*, 55 Ga. App. 376, 381-382 (190 SE 371) (1937)), or if it was "set in motion by the original wrong-doer," id. This would include intentional actions by someone other than the defendant who could reasonably be expected to take that action in response to the criminal conduct. It is foreseeable, for example, that in the course of a violent crime, deadly force

and therefore breaks the chain of proximate causation. See, e.g., *City of Richmond Hill v. Maia*, 301 Ga. 257, 259 (1) (800 SE2d 573) (2017) ("the well-established doctrine of intervening causes states that there can be no proximate cause where there has intervened between the act of the defendant and the injury to the plaintiff, an independent act or omission of someone other than the defendant, which was not *foreseeable* by defendant, was not triggered by defendant's act, and which was sufficient of itself to cause the injury") (citation and punctuation omitted). We have used the term "intervening cause" that way in the felony-murder context, too. See, e.g., *Menzies v. State*, 304 Ga. 156, 161 (II) (816 SE2d 638) (2018) ("Proximate causation imposes liability for the reasonably foreseeable results of criminal conduct if there is no sufficient, independent, and unforeseen intervening cause.") (citation and punctuation omitted). In contrast to that, here we refer to a causal force that *is* foreseeable and *does not* break the chain of causation, that is not directly part of the defendant's conduct, and that contributes to the victim's death. To distinguish this kind of causal force from an "intervening cause," we use the term "intervening act." See *Calhoun*, 308 Ga. at 149 (2) (a) (discussing "intervening act[s]" in this way).

18

will be used by an accomplice, see *Davis*, 290 Ga. at 760 (4) (defendant guilty of felony murder when his brother fatally shot the person from whom they were buying marijuana), the victim, see *Robinson v. State*, 298 Ga. 455, 456, 458-459 (1) (782 SE2d 657) (2016) (defendant guilty of felony murder when his accomplice was fatally shot by a store owner they were attempting to rob), or law enforcement, see *Calhoun*, 308 Ga. at 147, 150 (2) (a) (defendant who fled from police in high-speed car chase was guilty of felony murder when police used a "PIT" maneuver to end the pursuit, the defendant crashed, and his passenger was killed). Other intervening acts are reasonably foreseeable even though they are not intended by the defendant. Such foreseeable intervening acts can include causal forces that relate mostly to the victim, like the victim being especially vulnerable to harm, see *Eberhart v. State*, 307 Ga. 254, 260 (1) (b), 261-262 (2) (a) (835 SE2d 192) (2019) (defendant who repeatedly tased victim was guilty of felony murder when victim died from "hypertensive cardiovascular disease exacerbated by physical exertion and 'conducted electrical stimulation' from the application of the

TASERs"); see also *Treadaway v. State*, 308 Ga. 882, 885 (1) (843 SE2d 784) (2020) ("the offender takes her victim as she finds [her]" (cleaned up)); or the victim suffering a medical complication as a result of the defendant's conduct, see *Harris v. State*, 313 Ga. 653, 656-657 (1) (b) (872 SE2d 732) (2022) (defendant who shot victim during armed robbery was guilty of felony murder when, over a month after robbery, victim died from blood clots caused by shooting); *Franklin v. State*, 295 Ga. 204, 205-206 (1) (a) (758 SE2d 813) (2014) (defendant who assaulted victim and put him in a vegetative state that necessitated a tracheal breathing tube was guilty of felony murder when tracheal tube later dislodged and the victim died). And we have said that accidents are reasonably foreseeable intervening acts if they are "set in motion" by the original crime. See *Skaggs v. State*, 278 Ga. 19, 20 (1), 21 (3) (596 SE2d 159) (2004) (defendant who assaulted victim and caused him to fall and fatally hit his head on the ground was guilty of felony murder because "the fall itself was the direct and immediate result of" the assault and "[t]he only intervening force was gravity"); *Scott v. State*, 252 Ga. 251, 251 (1) (313 SE2d

20

87) (1984) (defendant guilty of felony murder when he and his accomplice were building or transporting an explosive device and it exploded, killing the accomplice).

In sum, proximate cause is satisfied for purposes of felony murder when the death was a "reasonably foreseeable result[ ]" of the criminal conduct at issue. *Robinson,* 298 Ga. at 458 (1) (citation and punctuation omitted). This requirement is met even if the death had an intervening act, so long as that intervening act was itself a reasonably foreseeable consequence of the criminal conduct. See id.

(iii) *"In the Commission of"*

The third requirement—that the victim's death must be caused "in the commission of" the predicate felony, OCGA § 16-5-1 (c)—is closely related to proximate cause in that it concerns the connection between the felony and the death. But while proximate cause focuses on whether the death was a reasonably foreseeable result of the criminal conduct, the in-the-commission-of requirement asks whether the cause of death was close enough in time and circumstances to the felony. See, e.g., *Smith v. State*, 307 Ga. 106, 113 (4)

21

(834 SE2d 750) (2019).[4]

We have said that a death is caused "in the commission of" a predicate felony if the cause of death is "within the res gestae" of the predicate felony. *Lee v. State*, 270 Ga. 798, 801 (4) (514 SE2d 1) (1999) (citation and punctuation omitted).[5] In plain English, this

[4] Given how similar the "in the commission of" and proximate cause requirements are, a set of facts that meets one of these requirements often will meet the other. For this reason, our decisions have sometimes conflated these requirements or addressed them together. See, e.g., *Smith*, 307 Ga. at 112-113 (4) (reasoning that the defendants' assault of the victim was "not the immediate cause" of the victim's death in part because the assault was "attenuated in time, in place, and most significantly, in circumstance" from the shooting of the victim). That said, these requirements arise out of different language in our felony-murder statute, and as we explain, they focus on slightly different inquiries. So we do not rule out the possibility that a particular set of facts could meet one of these requirements while failing to meet the other.

[5] Although we use the term "res gestae" here, we have largely abandoned that term, and in other contexts we rarely ask whether something occurred within the res gestae of a crime. For instance, while the old Evidence Code allowed the State to "present evidence of the entire res gestae of the crime," even if that evidence showed the commission of an additional uncharged crime, see *Johnson v. State*, 264 Ga. 456, 457 (1) (448 SE2d 177) (1994), the new Evidence Code does not use the term "res gestae," see *Johnson v. State*, 292 Ga. 785, 789 (4) n.4 (741 SE2d 627) (2013), and admits evidence of an uncharged crime only for specific purposes, see OCGA § 24-4-404 (b). Our cases using the "res gestae" approach to the "in the commission" requirement remain good law, see *Hood v. State*, 303 Ga. 420, 422 (1) (b) (811 SE2d 392) (2018) (explaining that a murder may be committed in perpetration of a felony if it is committed within the res gestae of the felony), but it is simpler to say, as we do here, that the "in the commission" requirement means that the cause of death must be close enough in time and circumstances to the felony.

means that the predicate felony must "be at least concurrent with [the homicide] in part, and be a part of it in an actual or material sense." *Davis*, 290 Ga. at 761 (5) (a).[6] The cause of death does not have to happen precisely *during* a felony to be "concurrent with [it] in part." *Lee*, 270 Ga. at 801 (4) (homicide "may be committed in the commission of a felony, although it does not take place until after the felony itself has been technically completed") (citation and punctuation omitted). But this statutory language limits how "attenuated in time, in place, and most significantly, in circumstance" it can

---

[6] The "at least concurrent in part" language was part of the pattern jury instruction on felony murder at the time of Eubanks's trial, see *Wilson*, 315 Ga. at 734-735 (5) & n.2 (noting that this language was included in the felony-murder pattern jury instruction in 2019), and that instruction was given in this case. However, the pattern jury instruction on felony murder no longer includes the "at least concurrent in part" language. The pattern instruction now states:

> You may find the Defendant guilty of felony murder if you believe that he/she caused the death of another person by committing the felony of _____, regardless of whether he/she intended the death to occur. There must be some causal connection between the felony and the death. Felony murder is not established simply because the death occurred at the same time as or shortly after the felony was attempted or committed. The felony must have directly caused the death or played a substantial and necessary part in causing the death, regardless of when the death ultimately occurred.

Georgia Suggested Pattern Jury Instructions, Vol. II: Criminal Cases (4th ed. 2007, updated Jan. 2023) § 2.10.30.

be. *Smith*, 307 Ga. at 113 (4). See also Wayne R. LaFave, 2 Subst. Crim. L. § 14.5 (f) (3d ed.) (noting that in applying the "in the commission of" requirement, which has roots in the "common law felony-murder rule," the cases stress that "the homicide and the [predicate felony] must be 'closely connected in point of time, place and causal relation.'").

Also like proximate cause, the "in the commission of" inquiry is fact-specific. Compare *Westmoreland v. State*, 287 Ga. 688, 689-690 (1) (699 SE2d 13) (2010) (death was caused "in the commission of" a burglary when the defendant fled from the completed burglary in a car and fatally struck another car) with *Smith*, 307 Ga. at 113 (4) (death was not caused "in the commission of" aggravated assault when the defendant assaulted the victim inside a nightclub, the fighting stopped for several minutes, the victim left the club, and *then* the defendant's fellow gang member shot the victim outside).

(b) *Application*

Count I of the indictment—the only felony-murder count on

which Eubanks was sentenced—charged Eubanks with felony murder predicated on possession of heroin with intent to distribute. The indictment alleged that Eubanks caused Amy's death "while in the commission of the Possession of Heroin with Intent to Distribute . . . by exposing said person to heroin while in the commission of the distribution thereof." Eubanks contends that the evidence was not sufficient to convict her of felony murder based on this predicate felony because it did not establish the prerequisites we just discussed above: that her felony was inherently dangerous; that her conduct was a proximate cause of Amy's death, or that Eubanks caused Amy's death "in the commission of" the felony. We take these requirements one at a time.

(i) *Inherently Dangerous*

As explained above, a felony may be considered "inherently dangerous" to life per se, or dangerous to life based on the circumstances in a given case. So this requirement is addressed by assessing the risks created by the "actual circumstances in which the felony was committed." *Treadaway*, 308 Ga. at 885 (1) (citation and

punctuation omitted). That assessment is particularly needed for mere possession offenses, which in many cases could be considered dangerous to life only based on the circumstances of a given case. For example, merely possessing a stolen car, see OCGA § 16-8-7 (a) ("[a] person commits the offense of theft by receiving stolen property when he . . . retains stolen property which he knows or should know was stolen"), may not be a per se danger to human life. But if a person drives that stolen car at a high rate of speed in a residential neighborhood and crashes it into another car, that particular possession could create a foreseeable risk of death and thus serve as a predicate for felony murder. See *Turner v. State*, 281 Ga. 487, 488-489 (1) (a) (640 SE2d 25) (2007). See also *Hines v. State*, 276 Ga. 491, 493 (3) (578 SE2d 868) (2003) (defendant guilty of felony murder based on possession of a firearm by a convicted felon when he used the firearm to go hunting after drinking, fired at an unidentified target at dusk through heavy foliage, and fatally shot his friend).

So too with drug-possession felonies. In the abstract, simple possession of drugs may not be per se dangerous to human life, but

our precedent is clear that a person can possess an illegal substance under circumstances that create a foreseeable risk of death. That was the case in *Stephens v. State*, 303 Ga. 530 (813 SE2d 596) (2018), and *Williams*, 298 Ga. 208, where we affirmed the felony-murder convictions of a couple who sold crack cocaine out of their home after their one-year-old child found their supply of the drug and ingested a lethal dose. *Williams*, 298 Ga. at 213-214 (2) (b). Those defendants typically kept their supply of crack cocaine "inside a hole in the living room sofa," which their child could reach, id. at 213 (2) (b), and we reasoned "[t]hat the presence of cocaine within the reach of a young child creates a risk of death is highly foreseeable," id. at 213-214 (2) (b). Thus, the defendants' possession of crack cocaine with intent to distribute was inherently dangerous to life "[u]nder the circumstances" of that case, and because the evidence supported the "unmistakable conclusion" that the child ingested the drug "after finding it in the place where [the defendants] stored it to sell to others," id. at 214 (2) (b), the evidence was sufficient to support their convictions for felony murder. Id.

*Williams* is on all fours with this case, at least in the ways that matter. The evidence here showed that Eubanks kept heroin, a lethal drug, in the home. She regularly used the drug herself and brought it out of the place she stored it to sell to others on at least one occasion. Amy, who also lived in and had access to the entire home, did not know enough to avoid touching, eating, or otherwise interacting with any heroin that she might find. Yet on the night of June 22-23, Eubanks left Amy home alone for several hours after Eubanks had not only carried out a drug deal in a common area of the home, but spilled a large bag of drugs "all over the place." Although Eubanks was not known to regularly store her heroin anywhere other than her own room and claimed that she cleaned up the drugs that had spilled, on that same evening, she was also observed acting strangely, from which the jury could infer that she was under the influence of drugs and that her ability to clean up or secure the drugs was impaired. Indeed, soon after Amy was found dead, Eubanks told her ex-husband she thought that Amy had "gotten" some of the heroin that she had spilled during the struggle, which could

happen only if the drugs that spilled had not been completely cleaned up. So, just as in *Williams*, the evidence authorized the jury to conclude that the defendant left potentially lethal drugs within reach of a person who was uniquely vulnerable to the danger that they would ingest or otherwise come into contact with the drugs, resulting in her death. See *Williams*, 298 Ga. at 213-214 (2) (b). Under these specific and unusual circumstances—a highly dangerous drug left within the reach of an adult with Amy's serious vulnerabilities, who was left alone with it for several hours—the evidence supported the jury's conclusion that Eubanks's possession of heroin with intent to distribute created a foreseeable risk of death. See id.

Eubanks tries to distinguish *Williams* on the basis that the defendants there could be said to have acted with "criminal negligence," while the evidence here supports only a conclusion that Eubanks caused Amy's death either by accident or through ordinary negligence. And, she points out, a "crime" in Georgia requires a violation of a statute by act or omission with "intention or criminal neg-

ligence." OCGA § 16-2-1 (a). But our decisions construing and applying our felony-murder statute have not required separate consideration of whether the defendant caused the death through "criminal negligence." Instead, the mens rea requirement of the statute is satisfied when the defendant had "the intent to commit the underlying felony," *Smith v. State*, 301 Ga. 348, 351 (II) (801 SE2d 18) (2017), and such felony was dangerous to life per se or under the circumstances. Together, these related requirements limit liability for felony murder to those cases in which the defendant intentionally committed a felony that she reasonably should have known could cause someone's death. When the State proves as much beyond a reasonable doubt, a sufficient mens rea for felony murder is present. See *Ware v. State*, 303 Ga. 847, 849 (II) (815 SE2d 837) (2018) ("felony murder requires only that the defendant possessed the requisite criminal intent to commit the underlying felony") (citation and punctuation omitted); *Ford*, 262 Ga. at 603 (1) ("[The] application of the [felony murder] rule to felonies not foreseeably dangerous would be unsound analytically because there is no logical basis for imputing

30

malice from the intent to commit a felony not dangerous to human life." (citation and punctuation omitted)).

(ii) *Proximate Cause*

As explained above, under the proximate-cause standard, liability may be imposed "for the reasonably foreseeable results of criminal conduct if there is no sufficient, independent, and unforeseen intervening cause." *Robinson,* 298 Ga. at 458 (1) (cleaned up). As a determination that requires "mixed considerations of logic, common sense, justice, policy, and precedent," whether proximate cause is satisfied "is undeniably a jury question and is always to be determined on the facts of each case." Id. (citation and punctuation omitted).

Here, the evidence authorized the jury to conclude that Eubanks's conduct proximately caused Amy's death. It was uncontested that Eubanks brought and kept a large amount of a lethal drug into a home where a severely developmentally disabled person lived and that Eubanks conducted a transaction for the drug, which

31

led to it spilling "all over the place" in an area to which that vulnerable person had free access. Amy's exposure to the heroin was a reasonably foreseeable consequence of this conduct. Keeping a dangerous drug in the home and bringing it out in the open risked exposing a person with Amy's vulnerabilities, and conducting a drug transaction in the home heightened that risk given the separate danger that drug transactions will lead to disagreements (and, too often, violence). Cf. *Wilson*, 315 Ga. at 733-734 (4) (recognizing that violence is foreseeable when transacting in illegal drugs); *Davis*, 290 Ga. at 760-761 (4) (same). That risk of exposure bore out here: Eubanks and Paul fought over the drugs and spilled them. And although Eubanks claimed that she tried to clean up the drugs that had scattered all over the common area, the jury could have inferred that Eubanks left some of the heroin behind, especially since there was evidence that she was likely under the influence herself at the time, and Eubanks herself told someone after Amy's death that she was worried that Amy had in fact come into contact with the spilled heroin. Finally, even if Amy later finding the heroin and ingesting it was an

"intervening act," the jury could have concluded that this was a reasonably foreseeable result of conducting a transaction for the drug in a common area of a house where a person with Amy's severe vulnerabilities lived, spilling the drug all over an area she could freely access, and then leaving her home alone for several hours. See *Williams*, 298 Ga. at 213-214 (2) (b). See also *Eberhart*, 307 Ga. at 260 (1) (b), 261-262 (2) (a) (victim's vulnerability to harm can be foreseeable); *Treadaway*, 308 Ga. at 885 (1) ("the offender takes her victim as she finds [her]" (cleaned up)). In short, the evidence authorized the jury to conclude that Amy's death was a reasonably foreseeable result of Eubanks's criminal conduct.

(iii) *"In the Commission of"*

Finally, the evidence authorized the jury to conclude that Eubanks caused Amy's death "in the commission of" the predicate felony—that is, sufficiently close in time, place, and circumstance to Eubanks's possession of heroin with the intent to distribute it. See *Hood v. State*, 303 Ga. 420, 423-424 (1) (b) (811 SE2d 392) (2018) (affirming felony-murder conviction when victim's death was

33

"closely related temporally and spatially to Appellant's felony of possession with intent to distribute cocaine"); *Wilson*, 315 Ga. at 734-735 (5) & n.2. A person commits the offense of possession with intent to distribute by possessing a controlled substance with the intent to distribute it; no actual distribution is necessary. OCGA § 16-13-30 (b). See also *Calloway v. State*, 303 Ga. 48, 56 (2) (b) (810 SE2d 105) (2018) ("The proof necessary to establish possession with intent to distribute is (1) possession of a controlled substance and (2) the intent to distribute it."). So Eubanks was committing this offense, for purposes of felony murder, for as long as she possessed heroin and intended to distribute it. The evidence authorized the jury, which was instructed about constructive possession, to conclude that she possessed heroin the entire time she kept some in her room and inside a black bag. See *Lebis v. State*, 302 Ga. 750, 753 (II) (808 SE2d 724) (2017) ("if a person has both the power and the intention at a given time to exercise dominion or control over a thing, then the person is in constructive possession of that thing" (cleaned up)). The

evidence also supported a conclusion that Eubanks's intent to distribute heroin continued through and beyond her transaction with Paul and Crystal on the night of June 22-23: she bought the heroin to resell it, and she did not intend to sell all of it to Paul and Crystal (she was angry that Paul had grabbed her entire supply, that is, more than she wanted to sell them at the time). And as discussed above, the evidence supported a conclusion that Amy's death was caused during that same timeframe, in the home where Eubanks possessed the heroin, by being exposed to the heroin in that home. Given this evidence, the jury was authorized to conclude that Eubanks caused Amy's death on the night of June 22-23 "in the commission" of possession with intent to distribute.

Eubanks contends that she did not cause Amy's death "in the commission" of her felony because her death did not happen "'within the *res gestae*' of the sale to Paul and Crystal." Eubanks points out that the indictment alleged that Eubanks caused Amy's death specifically by "exposing" Amy to heroin "while in the commission of the distribution thereof." But the State did not have to prove that Amy

died precisely *during* Eubanks's *distribution* of heroin to meet the "in the commission of" requirement: it had to prove only that the cause of death was sufficiently connected in time, place, and circumstance with Eubanks's possession with intent to distribute. See *Hood*, 303 Ga. at 423-424 (1) (b); *Cooper v. State*, 286 Ga. 66, 67 (2) (685 SE2d 285) (2009) ("There is no requirement that the victim must die during the commission of the underlying felony under a felony-murder indictment. OCGA § 16-5-1 (c), defining felony murder, requires that the death need only be *caused* by an injury which occurred during the res gestae of the felony." (citation and punctuation omitted)). And as we just explained, the evidence authorized that conclusion. See, e.g., *Skaggs*, 278 Ga. at 20 (1) (defendant guilty of felony murder for striking the victim, even though the victim actually died not from the defendant's blows but from injuries sustained when he fell to the ground as a result of being struck).

(c) In reaching the conclusion here that the evidence was sufficient to support Eubanks's conviction for felony murder, we are

mindful that reasonable people may disagree about whether some-one should be charged with and punished for murder when the evidence does not show an intent to harm (much less kill) the victim, but only that someone sold drugs out of her home. But that normative question is not one that a *court* has the power to resolve. Our limited role in considering the sufficiency of the evidence as a matter of due process is to determine whether the evidence, viewed in the light most favorable to the verdict, authorized the jury to find the defendant guilty of the statutory offense she was charged with. See *Peacock*, 314 Ga. at 714-715 (2) (b). Although the conviction here tests the limits put in place by our felony-murder statute, we are constrained to conclude that the evidence authorized Eubanks's conviction for felony murder as that statutory offense has been construed and applied.

That said, we reiterate here the longstanding limitations on felony murder that are grounded in the felony-murder statute. As relevant to Eubanks's arguments here, a conviction for felony murder must be predicated on the defendant having committed a felony

that is dangerous to life, either per se or under the circumstances of that case. See *Wilson*, 315 Ga. at 733 (4). The defendant's conduct must have been the proximate cause of the death that resulted. See *Calhoun*, 308 Ga. at 149 (2) (a). And the defendant must have caused that death "in the commission of"—sufficiently close in time, place and circumstance to—the felony. See *Wilson*, 315 Ga. at 734-735 (5) & n.2; *Hood*, 303 Ga. at 423-424 (1) (b). If the evidence in a given case does not support the conclusion that the State proved any one of these requirements beyond a reasonable doubt, a conviction for felony murder is not authorized.

3. Eubanks next raises a number of contentions about the trial court's jury instructions. Some of those contentions were raised below and others were not. Because different standards of review apply, we address those that were not raised below followed by those that were.

(a) Eubanks contends that the trial court erred by failing to specifically instruct the jury that a predicate felony for felony murder must be inherently dangerous. She also contends the court

38

should have given instructions on criminal negligence and accident, and an additional instruction on circumstantial evidence. She did not ask for any of these instructions below, so we review this claim only for plain error. See OCGA § 17-8-58 (b); *Ash v. State*, 312 Ga. 771, 791 (5) (a) (865 SE2d 150) (2021). "To show plain error, an appellant must show that (1) the alleged error was not affirmatively waived, (2) it was obvious beyond reasonable dispute, and (3) it affected the appellant's substantial rights, which ordinarily means showing that it affected the outcome of the trial." *Johnson v. State*, 316 Ga. 672, 686 (6) (889 SE2d 914) (2023) (citation and punctuation omitted). If those three requirements are satisfied, the appellate court "has the discretion to remedy the error only if the error seriously affected the fairness, integrity, or public reputation of judicial proceedings." *Moore v. State*, 315 Ga. 263, 273 (4) (882 SE2d 227) (2022) (cleaned up).

39

Eubanks has not established that the trial court committed obvious error in failing to give any of these instructions.[7] The trial court did not specifically instruct the jury that a predicate felony must be inherently dangerous, but "such an instruction is not required, even when requested." *Wilson*, 315 Ga. at 735 (5). See also

---

[7] The court properly defined felony murder for the jury, explaining that "[a] person also commits the crime of murder when, in the commission of a felony, that person causes the death of another human being, with or without malice." The court also defined the alleged predicate drug-possession felonies. Then it gave the following instructions:

> If you find and believe beyond a reasonable doubt that the defendant committed the homicide alleged in this bill of indictment at the time the defendant was engaged in the commission of the felony of possession of heroin, then you would be authorized to find the defendant guilty of murder, whether the homicide was intended or not.
>
> In order for a homicide to have been done in the commission of this particular felony, there must be some connection between the felony and the homicide. The homicide must have been done in carrying out the unlawful act and not collateral to it. It is not enough that the homicide occurred soon or presently after the felony was attempted or committed. There must be such a legal relationship between the homicide and the felony so as to cause you to find that the homicide occurred before the felony was at end or before any attempt to avoid conviction or arrest for the felony. The felony must have a legal relationship to the homicide, be at least concurrent with it in part, and be a part of it in an actual and material sense. A homicide is committed in the carrying out of a felony when it is committed by the accused while engaged in the performance of any act required for the full execution of a felony.

*State v. Kelly*, 290 Ga. 29, 34 (2) (b) (718 SE2d 232) (2011) (explaining that "our case law runs contrary to" the notion that a trial court must "instruct the jury explicitly that it must find as an element of the felony murder that the underlying felony . . . was committed in a manner that created a foreseeable risk of death"). As for the instructions on accident and criminal negligence, Eubanks grounds her arguments for those instructions in her assertion that the State must separately prove that Eubanks caused Amy's death intentionally or through "criminal negligence" to convict her for felony murder. But as we explained above, proof of the intent to commit an underlying felony that was inherently dangerous to life under the circumstances is enough to establish the mens rea for felony murder. See *Wilson*, 315 Ga. at 733 (4); *Ware*, 303 Ga. at 849 (II). Eubanks makes no argument here that the evidence would have supported a finding that she accidentally or through criminal negligence possessed heroin with the intent to distribute it.

Finally, Eubanks contends that the trial court's instruction on circumstantial evidence was incomplete. The trial court gave the

41

pattern instruction on direct and circumstantial evidence, which informs jurors that "[y]ou would be authorized to convict only if the evidence, whether direct, circumstantial, or both, excludes all reasonable theories of innocence and proves the guilt of the accused beyond a reasonable doubt." See Georgia Suggested Pattern Jury Instructions, Vol. II: Criminal Cases (4th ed. 2007, updated Jan. 2023) § 1.30.20. Eubanks says the court also should have told the jury that the State had to *disprove* any theory of innocence supported by the evidence. See OCGA § 24-14-6 ("To warrant a conviction on circumstantial evidence, the proved facts shall not only be consistent with the hypothesis of guilt, but shall exclude every other reasonable hypothesis save that of the guilt of the accused.").

Not including an instruction about "disproving" theories of innocence was not error. The jury was already told that it could convict only if the evidence "excludes all reasonable theories of innocence," and it was told that the State must prove Eubanks's guilt beyond a reasonable doubt. Those instructions effectively conveyed the point that the State was required to disprove reasonable hypotheses of

42

Eubanks's innocence. When a requested jury instruction adds no essential point of law to the existing instructions, it is not error for the trial court to decline to give it. See *Wilson*, 315 Ga. at 737-738 (7); *Francis v. State*, 296 Ga. 190, 194 (2) (766 SE2d 52) (2014) ("A trial court does not abuse its discretion in refusing to give a jury charge in the exact language requested when the charge given substantially covers the correct principles of law." (citation and punctuation omitted)).

(b) Eubanks contends that the trial court erred by declining to give her requested jury instructions on the definition of a crime. "We review de novo a properly preserved claim that a trial court erred in refusing to instruct the jury on an applicable principle of law." *Wilson*, 315 Ga. at 734 (5).

Eubanks asked for the pattern jury instruction on the definition of a crime. The pattern instruction explains that "[a] crime is a violation of a statute of this state in which there is a joint operation of an act (or omission to act) and intention (or criminal negligence)." See Georgia Suggested Pattern Jury Instructions, Vol. II: Criminal

Cases (4th ed. 2007, updated Jan. 2023) § 1.40.10. The trial court's actual instruction tracked the pattern instruction exactly, except that it omitted the parentheticals, "(or omission to act)" and "(or criminal negligence)." Eubanks argues that because those parentheticals were omitted, the jury instruction did not conform to the evidence, because the only way Eubanks could be guilty of a felony murder charge was through criminal negligence. But again, that is not so. As we explained above, the intent to commit an underlying felony that was inherently dangerous to life under the circumstances suffices as the mens rea for felony murder, see *Wilson*, 315 Ga. at 733 (4); *Ware*, 303 Ga. at 849 (II), and Eubanks makes no argument that the evidence would have supported a finding that she committed her predicate felonies through criminal negligence. This claim of error fails.

4. Eubanks contends that the trial court erred by denying her special demurrer to the indictment because the indictment did not adequately inform her of the time and manner in which she was al-

leged to have exposed Amy to heroin.[8] "We review a ruling on a special demurrer de novo to determine the legal sufficiency of the allegations in the indictment." *Wilson*, 315 Ga. at 732 (3) (citation and punctuation omitted).

Count I of the indictment charged Eubanks with felony murder for causing Amy's death on June 23, 2019, "while in the commission of the Possession of Heroin with Intent to Distribute . . . by exposing said person to heroin while in the commission of the distribution thereof." Count III charged her with felony murder for causing Amy's death on June 23, 2019, "while in the commission of the Possession of Heroin . . . by exposing said person to heroin while in the possession thereof." Counts II and IV charged her with, respectively, possessing heroin with intent to distribute and possessing heroin, all on June 23, 2019.

---

[8] Eubanks also challenges the indictment on grounds that she did not raise below, including that Count I was duplicitous and that the indictment did not allege that she knowingly possessed heroin. Those arguments are not preserved for appeal. See *Hinkson v. State*, 310 Ga. 388, 395 (3) (850 SE2d 41) (2020) (special demurrer claims must be brought before trial or they are waived); id. at 397-398 (4) (general demurrer claims that are not timely asserted through an appropriate vehicle in the trial court are not preserved for review).

The purpose of an indictment is to "allow the defendant to prepare his defense intelligently and to protect him from double jeopardy." *Sanders*, 313 Ga. at 195 (3) (citation and punctuation omitted). To satisfy due process, an indictment must "contain all the essential elements of the crime" and must "notify the accused of what factual allegations he must defend in court." *Jackson v. State*, 301 Ga. 137, 139-140 (1) (800 SE2d 356) (2017) (citation and punctuation omitted). So the test for whether an indictment is constitutionally sufficient is not whether it might be made more definite and certain, but only whether it "sufficiently apprises the defendant of what he must be prepared to meet, and, in case any other proceedings are taken against him for a similar offense, whether the record shows with accuracy to what extent he may plead a former acquittal or conviction." *Sanders*, 313 Ga. at 195 (3) (citation and punctuation omitted). The State need not allege all the details of the crime in an indictment so long as the allegations contain enough detail to "allow a defendant to prepare his defense intelligently." *Bullard v. State*, 307 Ga. 482, 486-487 (2) (837 SE2d 348) (2019) (cleaned up).

46

Eubanks's indictment met that standard. The State charged Eubanks in the predicate counts with possessing heroin and intending to distribute it on June 23, 2019, and it charged her in the felony-murder counts with "exposing" Amy to heroin on that date, either while distributing the drug (Count I) or while she possessed it (Count III). The State did not allege precisely how or when Amy was "exposed," but doing so was not required to satisfy due process. See *Bullard*, 307 Ga. at 486-487 (2). Read as a whole, as it must be, see *Sanders*, 313 Ga. at 196 (3) (a) (ii), the indictment charged Eubanks with causing Amy's death by exposing her to the drug on June 23, while Eubanks possessed or distributed it. Those allegations were specific enough to allow Eubanks to prepare an intelligent defense. Indeed, that conclusion is supported by the defenses that Eubanks asserted: among other things, she elicited on cross-examination that neither Shawn nor the deputies saw any drugs in the house on the day Amy's body was found, which could support a defense that the drugs were not in Amy's reach, and she elicited from the medical examiner that it was not clear how heroin got into Amy's system or

47

exactly when she died.

The indictment also protected Eubanks against the dangers of double jeopardy in a possible future proceeding. The indictment informed her that the charges arose out of conduct that resulted in Amy's death, stated the nature of that conduct, and set out the date on which the conduct took place.  Given all that, "it cannot reasonably be argued that [she] is not protected from the dangers of double jeopardy." *State v. Grube*, 293 Ga. 257, 262 (2) (744 SE2d 1) (2013) (indictment sufficient to protect against double jeopardy when it specified the conduct being charged, identified the victim, and named the date on which the conduct took place).

In sum, Eubanks's indictment, although not very detailed, was constitutionally sufficient, and so this claim of error fails. See, e.g., *Funck v. State*, 296 Ga. 371, 373 (1) & n.3 (768 SE2d 468) (2015) (indictment that charged defendant with felony murder for causing the victim's death while in the commission of attempt to possess cocaine "by striking him with a vehicle" was constitutionally sufficient); *State v. Wyatt*, 295 Ga. 257, 261 (2) (a), 266 (3) (759 SE2d 500)

48

(2014) (indictment that charged defendant with aggravated assault by assaulting victim "with an object the exact nature of which is unknown to the members of the Grand Jury, which when used offensively against another person is likely to result in serious bodily injury" was constitutionally sufficient). Compare *Kimbrough v. State*, 300 Ga. 878, 882-883 (3) (799 SE2d 229) (2017) (indictment not constitutionally sufficient when it did not allege how the defendants were associated with an enterprise, whether the enterprise was licit or illicit, or how the defendants' alleged racketeering activities related to the enterprise).

5. Eubanks next contends that the trial court abused its discretion by admitting a hearsay statement from Amy that Eubanks was "mean" to her. The statement was admitted over objection through the testimony of Lisa Bennett, the director of an adult educational program for adults with mental disabilities that Amy attended. Bennett was asked about Amy's ability to express emotions. Bennett testified that Amy once told her, "Jessica mean," and when she asked what Amy meant, Amy replied, "I not know."

Assuming without deciding that it was an abuse of discretion to admit Amy's statement through Bennett, any error was harmless. A non-constitutional error is harmless if it was "highly probable that the alleged error did not contribute to the verdict." *Head v. State*, 316 Ga. 406, 416 (3) (888 SE2d 473) (2023). Under this standard, admitting inadmissible evidence can be harmless if "substantial, cumulative, legally admissible evidence of the same fact is introduced." Id. at 417 (3) (citation and punctuation omitted). In determining whether an error was harmless, "we review the record de novo, and we weigh the evidence as we would expect reasonable jurors to have done so." *Middlebrooks v. State*, 315 Ga. 671, 684 (1) (884 SE2d 318) (2023) (citation and punctuation omitted).

The admission of Amy's remark that Eubanks was "mean" to her was harmless because it did not relate to the State's theory of the case and because it was cumulative of other evidence that Amy and Eubanks did not have a warm relationship. The State never argued that Eubanks intended to harm Amy or that she caused her death out of antipathy toward her, nor did it need to: the only intent

the State had to prove was Eubanks's intent to possess heroin and that she intended to distribute it. And even if Amy's remark might have colored the jury's view of Eubanks, it was largely cumulative of other evidence that she and Eubanks did not get along. Shawn described their relationship as "cool" and indifferent, and said that when Eubanks was around, Amy would usually be in her room. And one of Amy's former caretakers testified that after Eubanks moved into the house, Amy was more timid and reserved and less happy-go-lucky, at least when she was at home. Given that other evidence and that the State's theory of the case did not involve showing that Eubanks intended to harm Amy, it is highly probable that Amy's comment about Eubanks being "mean" to her did not affect the verdict. See *Head*, 316 Ga. at 416 (3).

6. Finally, Eubanks contends that the trial court abused its discretion by admitting four videos of Amy during life. The videos, which were shown at trial, lasted a total of two minutes and twenty seconds and depicted Amy learning the pledge of allegiance, visiting a pet store, playing softball, and hugging a new purse. The State

argued that the videos would show Amy's level of cognitive skill and hand-eye coordination. But in Eubanks's view, the videos were not relevant and were introduced only to play on the jury's sympathies. We review a trial court's evidentiary rulings for abuse of discretion. See *Jones v. State*, 305 Ga. 653, 655 (2) (827 SE2d 254) (2019).

Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." OCGA § 24-4-401. Relevant evidence is generally admissible, see OCGA § 24-4-402, but it may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice," OCGA § 24-4-403 ("Rule 403"). Evidence carries a danger of "unfair prejudice" if it has a tendency to "lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged," or to "suggest decision on an improper basis." *Old Chief v. United States*, 519 U.S. 172, 180 (II) (B) (1) (117 SCt 644, 136 LE2d 574) (1997) (citation and punctuation omitted). See also *Wilson*, 315 Ga. at 738 (8). But the exclusion of evidence under Rule 403 is "an

extraordinary remedy that should be used only sparingly." Id. (citation and punctuation omitted). The "major function" of the rule is to "exclude matter of scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial effect." *Hood v. State*, 299 Ga. 95, 103 (4) (786 SE2d 648) (2016) (cleaned up).

Here, the videos of Amy were relevant to show her limited cognitive development. That was an important fact because, as we explained above, the State needed to show how Eubanks's possession of heroin could proximately cause Amy's death. See *Wilson*, 315 Ga. at 733 (4). The "in-life" videos helped the State do that, because Amy's vulnerability was a major reason it was possible for her to come in contact with and ingest a lethal dose of heroin without knowing any better. To be sure, the videos also likely played on the jury's sympathies, and they may have carried a danger of prejudice. But they were not *very* prejudicial: they showed Amy doing very normal activities, and they took up less than two and a half minutes of trial time. And they had clear probative value, and so were not "dragged in by the heels for the sake of [their] prejudicial effect."

*Hood*, 299 Ga. at 103 (4) (citation and punctuation omitted). The trial court did not abuse its discretion in admitting them. See *Jones*, 305 Ga. at 655 (2).

*Judgment affirmed. All the Justices concur, except LaGrua, J., who concurs specially in part.*

LAGRUA, Justice, concurring specially in part.

I concur fully in the judgment and in Divisions 1, 2 (a), 2 (b), 3, 4, 5, and 6. But I do not agree with all that is said in Division 2 (c), so I concur specially in that part of the opinion.

Decided October 24, 2023.

Murder. Forsyth Superior Court. Before Judge Dickinson.

*Clark & Towne, David E. Clark, Jessica R. Towne*, for appellant.

*Penny A. Penn, District Attorney, Caroline Yi, Assistant District Attorney; Christopher M. Carr, Attorney General, Beth A. Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Meghan H. Hill, Assistant Attorney General*, for appellee.